-FOR PUBLICATION-

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JENNIFER GORDON, VALERIE TANTLINGER and JENNIFER UNDERWOOD, on Behalf of Themselves and All Others Similarly Situated**<br>**Plaintiffs,**<br><br>**v.**<br><br>**KOHL'S DEPARTMENT STORES, INC. and CAPITAL ONE, NATIONAL ASSOCIATION,**<br>**Defendants.** | **CIVIL ACTION**<br><br><br><br>**NO.  15-730** |

## OPINION

In this putative class action, Plaintiffs Jennifer Gordon, Valerie Tantlinger, and Jennifer Underwood allege that Defendants Kohl's Department Stores, Inc. ("Kohl's") and Capital One, National Association ("Capital One") improperly charged them for two "enhancement products" related to their Kohl's-branded credit card accounts.  Plaintiffs claim that they were enrolled in the programs without authorization and that the programs had little or no value.  Based on these factual allegations, Plaintiffs' Second Amended Complaint ("SAC") asserts claims for unjust enrichment and a breach of the implied covenant of good faith and fair dealing.  Defendants have filed a motion to dismiss Plaintiffs' claims in their entirety.  For the reasons described herein, Defendants' motion shall be granted, in part, and denied, in part.

I.      **BACKGROUND**[1]

        **A.  Kohl's-Branded Credit Cards**

        The Kohl's-branded credit cards ("Cards") at issue in this case are a joint venture

between Capital One and Kohl's.  Capital One is one of the 10 largest banks in the United States,

based on deposits, with approximately $204 billion in deposits and $300 billion in total assets.

SAC ¶ 25.  Kohl's is a Wisconsin-based department store chain, with over one thousand stores

throughout the United States, as well as multiple websites on which customers may shop for

merchandise.  SAC ¶ 24.  Pursuant to a Private Label Credit Card Program Agreement (the

"Private Label Agreement") Kohl's markets the Cards (which Cards bear the mark of the Kohl's

store brand) to their customers and services the Cards on behalf of Capital One.   It is, however,

Capital One which issues the Cards and with which customers enter into a cardmember

agreement (the "Capital One Cardmember Agreement").  SAC ¶ 25, Ex. 2.

        Prior to 2011, the Cards were issued by Chase Bank, N.A. ("Chase"), and customers were

thereby parties to a cardmember agreement with Chase (the "Chase Cardmember Agreement").

SAC ¶ 1; Defs.' Mot. Exs. A, B, C.  The Chase Cardmember Agreement provides that Chase

"may assign your Account, any amounts you owe us, or any of our rights and obligations under

this Agreement to a third party."  Defs.' Mot. Ex. A ¶ 23.  Capital One acquired the Card

program from Chase, effective April 1, 2011.  SAC ¶¶ 1, 26, Ex. 1.  At the time, the program

served more than 20 million customers, with an outstanding balance of approximately $3.7

billion.  *Id.*  The Kohl's-branded credit card portfolio was the only Chase asset acquired by

Capital One in this transaction.  SAC ¶ 27.

---

[1] This factual background is drawn only from the pleadings and other documents that are integral to Plaintiffs'
pleadings, which thus may be considered in deciding a Rule 12(b)(6) motion to dismiss.  *See Pension Benefit Guar.
Bd. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

Upon the transfer of the Card accounts ("Accounts") to Capital One, all cardholders were sent the Capital One Cardmember Agreement.  SAC ¶ 30.  The Capital One Cardmember Agreement states: "This agreement ('Agreement') governs your Kohl's credit card Account ('Account') with us.  Please keep this Agreement for your records.  You agree with us that the following terms apply to your Account."  SAC Ex. 2 at 2.  The Capital One Cardmember Agreement defines "us" to refer to "Capital One, N.A., the creditor and issuer of the Account and any other person to whom this Agreement and/or the Account may be assigned."  *Id.* at 2:1.

### B.  KAE and PrivacyGuard

Plaintiffs' claims arise from charges imposed on their Accounts for two ancillary "enhancement products" which are not mentioned by name in the Capital One Cardmember Agreement:  Kohl's Account Ease ("KAE") and PrivacyGuard.  SAC ¶ 3.  Under the Private Label Agreement, the profits from fees for ancillary products such as KAE and PrivacyGuard are shared by Capital One and Kohl's.  SAC ¶ 28.

### 1.  KAE

KAE is a product that "purports to cancel a consumer's account balance, up to a certain dollar amount, in the event of a qualifying event due to involuntary employment, disability, hospitalization or death."  SAC ¶ 36.  The fee for KAE is $1.60 per each $100 of a customer's ending monthly balance.  *Id.*

The in-store applications for Chase-issued Cards included a KAE Benefit Summary/Disclosure, which provides, in part:

> Kohl's Account Ease (KAE) is an optional amendment to your Cardmember Agreement under which we may cancel the balance on your Account up to a maximum of $10,000. The Plan works when you, your Spouse or Domestic Partner, an Authorized User of your Account, or a Higher Wage Earner in your Household experience a qualifying event.

Defs.' Mot. Exs. A, B, C.  However, the Capital One Cardmember Agreement that Plaintiffs claim they received when their Accounts were transferred to Capital One does not contain the KAE Benefit Summary/Disclosure.  SAC Ex. 2.

The full terms of KAE are set forth in the Kohl's Account Ease Plan Amendments to Cardmember Agreements (the "KAE Amendments") issued by each bank.  Defs. Mot. Ex. E; Pls.' Opp. Ex. 4.  Both the Chase and Capital One KAE Amendments provide that "[a]ll provisions of your [Cardmember] Agreement remain in full force and effect.  In the event of a conflict between your Agreement and this Amendment, the terms of this Amendment will govern."  Defs.' Mot. Ex. E ¶ 15; Pls.' Opp. Ex. 4 ¶ 15.  The provision defining the parties to the KAE Amendments does not include assignees, and assignment is not mentioned anywhere in either KAE Amendment.  Defs.' Mot. Ex. E ¶ 1.1(k); Pls.' Opp. Ex. 4 ¶ 1.1(k).

Both the Chase and Capital One KAE Amendments grant the banks the authority to change the terms of KAE at any time, although "adverse changes will not take effect until [the bank] ha[s] provided you with written notice and a reasonable opportunity to cancel your agreement without penalty before the changes go into effect."  Defs.' Mot. Ex. E ¶ 10; Pls.' Opp. Ex. 4 ¶ 10.  A significant difference between the Chase and Capital One KAE Amendments it that the Chase KAE Amendment provides that it shall be governed by Delaware law, while the Capital One KAE Amendment contains a Virginia governing law provision.  Defs.' Mot. Ex. E ¶ 16; Pls.' Opp. Ex. 4 ¶ 16.

### 2. PrivacyGuard

PrivacyGuard is a product which purports to provide customers with credit monitoring and credit report retrieval services in exchange for a monthly fee of $14.99.  SAC ¶ 5, 44. PrivacyGuard is not mentioned in either the Chase or Capital One Cardmember Agreement, or in

any of the in-store Card applications currently before the Court.  Defs.' Mot. Exs. A, B, C.

However, Schedule 6.3(c) to the Private Label Agreement, which describes "Bank Enhancement

Products" to be offered by Capital One, provides that, in addition to KAE, the "[b]ank will offer

Cardholders an identify [sic] theft protection service called 'PrivacyGuard.'" Pls.' Opp. Ex. 2.

### C.  Plaintiffs' Kohl's-Branded Credit Card Accounts

#### 1.  Gordon (KAE Claims Only)

Plaintiff Jennifer Gordon ("Gordon"), a resident of Pennsylvania, opened her Account at

a Pennsylvania Kohl's department store in 2010.  SAC ¶ 11.  Kohl's records reflect that Gordon

was enrolled in KAE on September 27, 2010, and that she was subsequently sent a copy of the

Chase KAE Amendment.  Defs.' Mot. Ex. E.  After Capital One took over the Accounts in April

2011, Gordon received a new Capital One-issued Card and a copy of the Capital One

Cardmember Agreement.  SAC ¶ 11.  The Capital One Cardmember Agreement received by

Gordon did not reference KAE or expressly incorporate by reference any prior agreements to

which Gordon was a party.  SAC ¶ 12.  Gordon asserts that she did not authorize Capital One or

Kohl's to charge her for KAE at any point after April 1, 2011.  *Id.*

In October 2013, Gordon discovered KAE charges on her Account statement.  SAC ¶ 13.

Upon further investigation, Gordon realized that she had been charged over $400 in KAE fees

between April 19, 2011 and the filing of the SAC in this case.  SAC ¶ 13.  Gordon's Account

remained opened as of the end of 2014, and KAE fees continued to appear on her monthly

statements at that time.  Defs.' Mot. Ex. G.

#### 2.  Tantlinger (KAE Claims Only)

Plaintiff Valerie Tantlinger ("Tantlinger"), a resident of Pennsylvania, opened her

Account in 2007.  SAC ¶ 14.  Kohl's records reflect that Tantlinger was enrolled in KAE on

March 3, 2007, and she was subsequently sent a copy of the Chase KAE Amendment.  Defs.'

Mot. Ex. E.  Between November 2008 and May 2012, Tantlinger did not use her Card, and her

Account became inactive.  *Id.*  On May 11, 2012, Tantlinger unsuccessfully attempted to use her

inactive Card at a Kohl's store.  SAC ¶ 15.  A Kohl's representative at the store requested

Tantlinger's personal information, which she provided.  *Id.*  Tantlinger subsequently received a

new Capital One-issued Card accompanied by a Capital One Cardmember Agreement in the

mail.  *Id.*  The Capital One Cardmember Agreement received by Tantlinger did not reference

KAE or expressly incorporate by reference any prior agreements to which Tantlinger was a

party, and Tantlinger asserts that she did not authorize Defendants to charge her for KAE at any

point after the issuance of the Capital One Cardmember Agreement.  SAC ¶ 16.

　　　In June 2013, Tantlinger discovered charges to her Account for KAE.  SAC ¶ 17.  Upon

investigation, Tantlinger realized that she had been charged over $200 for KAE between May 11,

2012 and June 11, 2013.  SAC ¶ 17.  Tantlinger's Account statements indicate that she was not

charged for KAE at any point after June 2013.  Defs.' Mot. Ex. H.

### 3.  Underwood (KAE and PrivacyGuard Claims)

　　　Plaintiff Jennifer Underwood ("Underwood"), a resident of California, opened her

Account at a Kohl's department store in 2009.  SAC ¶ 18.  Kohl's records reflect that

Underwood was enrolled in KAE on January 12, 2009, and she was subsequently sent a copy of

the Chase KAE Amendment.  Defs.' Mot. Ex. E.  After Capital One took over the Accounts in

April 2011, Underwood received a Capital One-issued Card and a copy of the Capital One

Cardmember Agreement.  SAC ¶¶ 18-19.  The Capital One Cardmember Agreement received by

Underwood did not reference KAE or PrivacyGuard, nor did it expressly incorporate by

reference any prior agreements to which Underwood was a party.  SAC ¶ 19.  Underwood asserts

that she did not authorize Capital One or Kohl's to charge her for KAE or PrivacyGuard at any point after April 1, 2011.  SAC ¶ 12.

In October 2011, Underwood paid her Account balance in full.  SAC ¶ 20.  Two months later, despite having made no additional Kohl's purchases with the Card, Underwood discovered that she had an Account balance of $71.44, consisting entirely of fees for PrivacyGuard, as well as late fees, KAE fees, and interest associated with the unpaid balance arising from the PrivacyGuard charges.  SAC ¶ 20.  She immediately paid the entire balance and made no further purchases with the Card.  *Id.*  On April 11, 2012, Underwood was alerted by Kohl's that her Account balance exceeded $100, again arising entirely from PrivacyGuard fees, and the interest, late fees, and KAE fees arising from charges for PrivacyGuard.  *Id.*  On that date, Underwood immediately paid her balance in full, closed her Account, and cancelled PrivacyGuard and KAE—despite being told by a Kohl's representative that cancelling PrivacyGuard would hurt her credit score.  SAC ¶¶ 20-21.  In June 2012, Underwood discovered that she had been charged for PrivacyGuard in April, May, and June of that year, and that the balance created by these charges had again led to the accrual of interest fees, late fees, and KAE fees.  SAC ¶ 22; Defs. Mot. Ex. I.  Underwood's Account was marked closed on her July 2012 statement.  Defs.' Mot. Ex. I.  In October 2014, Underwood learned that Defendants had filed a negative report on her credit report resulting from the late payments for KAE and/or PrivacyGuard charges.  SAC ¶ 23.

Underwood claims that she did not receive credit monitoring services, a credit report, or any other PrivacyGuard services.  SAC ¶ 43.  She further alleges that Defendants failed to obtain the necessary authorization that would have allowed them to access her credit report, and thus

that Defendants could not have provided PrivacyGuard services at any time during her purported

enrollment in the program.  SAC ¶ 43.[2]

**D.** *Kardonick* **Settlement**

According to the Plaintiffs, Chase's and Capital One's practices in relation to KAE have

yielded penalties from the Consumer Financial Protection Bureau ("CFPB") and the Office of

the Comptroller of the Currency ("OCC"), as well as multiple law suits in federal court.  SAC ¶

35.  One such lawsuit was *Kardonick v. J.P. Morgan Chase Co.*, a class action filed in 2010

against Chase.  *See* Complaint, *Kardonick v. J.P. Morgan Chase Co.*, No. 1:10-cv-23235 (S.D.

Fla. Sept. 8, 2010).  The *Kardonick* suit was settled on a class basis according to the terms of a

Stipulation and Agreement of Class Action Settlement (the "*Kardonick* Settlement Agreement")

submitted on December 21, 2010.  Pls.' Mot. Ex. K; Stipulation and Agreement of Class Action

Settlement, *Kardonick v. J.P. Morgan Chase Co.*, No. 1:10-cv-23235 (S.D. Fla. Dec. 21, 2010),

ECF No. 16.  The *Kardonick* settlement class consists, *inter alia*, of all cardholders of a Chase-

issued Kohl's-branded credit card who were billed for KAE between September 1, 2004 and

November 11, 2010.  Defs.' Mot. Ex. K § II(pp).

The *Kardonick* Settlement Agreement was preliminarily approved on February 11, 2011,

Corrected Order, *Kardonick v. J.P. Morgan Chase*, No. 1:10-cv-23235 (S.D. Fla. Feb. 11, 2011),

ECF No. 24, (conditionally certifying a settlement class and preliminarily approving the class

action settlement), and received final approval on September 16, 2011.  Final Judgment and

Order of Dismissal, *Kardonick v. J.P. Morgan Chase*, No. 1:10-cv-23235 (S.D. Fla. Sept. 16,

2011), No. ECF No. 384.

---

[2] There is no express assertion in the SAC that Underwood did not provide authorization to access her credit information.  However, such an allegation can be fairly inferred from paragraph 43 of the SAC, which alleges that such authorization is necessary but that Defendants "[n]onetheless" charged Underwood for PrivacyGuard.

## II.     LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "In light of *Twombly*, it is no longer sufficient to allege mere elements of a cause of action; instead a complaint must allege facts suggestive of the proscribed conduct."  *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 177 (3d Cir. 2010) (internal quotation marks and brackets omitted).  A plaintiff need not show that success on his or her claims is probable, but must assert "'enough facts to raise a reasonable expectation that discovery will reveal evidence of'" each necessary element in a claim.  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  However, "'[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'"  *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678).  At bottom, the question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold."  *Skinner v. Switzer*, 562 U.S. 521, 529-530 (2011) (internal quotation marks and citations omitted).

In considering a plaintiff's claims, the Court must construe the facts and draw all reasonable inferences in the light most favorable to the plaintiff.  *Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.)*, 768 F.3d 284, 290 (3d Cir. 2014).  However, the Court may look to documents that are attached to a complaint and on which a plaintiff relies to determine if the documents support or contradict the legal or factual claims in

the complaint.  *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 427 (3d Cir. 1999).

## III.   DISCUSSION

This analysis must be viewed with the procedural posture of this case firmly in mind. The motion before the Court is a Rule 12(b)(6) motion to dismiss.  Such a motion presents a single, narrow question:  Have Plaintiffs, based on the factual allegations in the SAC and the documents upon which it relies, plausibly pled a claim for relief?  Plaintiffs need not definitively prove their case to survive a motion to dismiss, and denial of a motion to dismiss does not indicate that Plaintiffs will ultimately succeed—or even that success is likely.  Rather, survival of claims at this stage means only that, drawing all reasonable facts and inferences in Plaintiffs' favor, Plaintiffs have provided adequate factual basis to show a reasonable likelihood that discovery will allow them to prove their claims.  Whether the broader record that may be reviewed at a later stage will ultimately support Plaintiffs' claims is a question for another day.

### A.  *Exhibits*

Because the Court declines to convert Defendants' Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment, it is necessary to determine which, if any, of the numerous exhibits submitted by the parties may be considered at this stage.[3]  In considering a motion to dismiss, a district court is generally limited to "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record."  *Pension Benefit Guar. Bd. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  However, a court may also consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  *Id.*  This narrow

---

[3] At oral argument, Plaintiffs stipulated to the consideration of Defendants' Exhibits A, B, C, D, E, J, and K at this stage, as well as the consideration of Exhibits G, H, and I to the extent that such documents reflect Account activity after April 1, 2011.

category of exhibits which may be considered includes only those which are "*integral to or explicitly relied* upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotation marks omitted).  Documents that are relevant to claims, but which do not serve as the basis of the claims, are not properly considered at the motion to dismiss stage.  *See Schmidt v. Skolas*, 770 F.3d 241, 249-50 (3d Cir. 2014).

### 1. Defendants' Exhibits

Several, but not all, of the exhibits attached to Defendants' motion to dismiss fall within the narrow scope of documents that may be considered at this stage:

- Defendants' Exhibits A, B and C are in-store Card applications and Chase Cardmember Agreements corresponding to the years in which each Plaintiff applied for her Card.  These documents may be considered at this stage because these Agreements are relied upon in the SAC to argue that the lack of reference to KAE in the Capital One Cardmember Agreements Plaintiffs received represented a material change from the original Chase Cardmember Agreement;

- Exhibit D contains a 2011 Capital One-issued in-store application and a cardmember agreement that was presented to new card applicants in 2011.  Plaintiffs' claims are not based on the 2011 in-store application, and the cardmember agreement contained in Exhibit D is different from the Capital One Cardmember Agreement that Plaintiffs attached to the SAC.  Accordingly, Exhibit D is not integral to Plaintiffs' claims and shall not be considered;[4]

- Exhibit E contains each Plaintiff's Chase KAE Amendment.  Plaintiffs concede that these documents provide integral support for their claim that the terms of the KAE program changed when Capital One acquired the Accounts.  Therefore, Exhibit E shall be considered;

- Exhibit F is a purported version of the PrivacyGuard Terms and Conditions printed from the PrivacyGuard website in February 2016.  Plaintiffs do not rely upon or even reference the PrivacyGuard Terms and Conditions in the SAC.   Furthermore, even if Underwood's

[4] Plaintiffs agreed to the consideration of Exhibit D at oral argument, apparently believing that it is substantially the same as the exemplar Capital One Cardmember Agreement attached to the SAC as Exhibit 2.  It is not.  In addition to several organizational difference between the documents, Defendants' Exhibit D includes sections on Additional Cards and Telephone Monitoring that do not appear in SAC Exhibit 2, and SAC Exhibit 2 contains sections on Account Information and Credit Marketing that do not appear in Defendants' Exhibit D.  More importantly, Exhibit D contains a reference to KAE that is not present in Exhibit 2.  Given that Plaintiffs' concession that Exhibit D contains the terms they received appears to have been the result of a misunderstanding at oral argument, this concession will be disregarded and the Court will assume as true Plaintiffs' assertion in the SAC that SAC Exhibit 2 is an exemplar of the terms they received with their Capital One-issued Cards.

claims could be construed as arising from some type of PrivacyGuard contract, a generic 2016 version of the terms printed from the Internet is neither an authentic version of any terms provided to Underwood, nor even a relevant consideration in evaluating her claims—which arose in 2011, 2012, and 2013. Accordingly, Exhibit F shall not be considered;

- Exhibits G, H, and I consist of Plaintiffs' Account statements, which document the charges giving rise to their claims, and will therefore be considered insofar as they memorialize activity after April 1, 2011, which is the earliest date on which Plaintiffs have asserted a claim in this case;

- Exhibit J is a schedule to the Private Label Agreement. Since Plaintiffs attached the main body of the Private Label Agreement to the SAC and the Private Label Agreement relies heavily on schedules to define various provisions, it necessary to consider those schedules in order to complete the document attached to the SAC. Exhibit J will thus be considered;

- Finally, Exhibit K is the *Kardonick* Settlement Agreement. The Third Circuit has consistently held that class action settlements provide a valid basis for claim preclusion at the motion to dismiss stage. *See Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 277 (3d Cir. 2014). Thus, the *Kardonick* Settlement Agreement may be considered at this point.

In sum, the Court will consider Defendants' Exhibits A, B, C, E, J, and K in full, and

Exhibits G, H, and I to the extent that they reflect Account activity after April 1, 2011.

Defendants' Exhibits D and F shall not be considered.

### 2. Plaintiffs' Exhibits

In addition to the SAC and its attached exhibits, which provide the operative basis of

Plaintiffs' claims, Plaintiffs submitted several exhibits during the briefing and argument of this

motion. All six of the exhibits that Plaintiffs have attached to their response in opposition to

Defendants' motion may be considered:

- Exhibit 1 is an execution copy of the Private Label Agreement, and may thus be considered as it is as an authentic version of the document attached to the SAC;

- Exhibits 2 and 3 are schedules to the Private Label Agreement and, just as Defendants' Exhibit J, may be considered as part of a document attached to the SAC;

- Exhibit 4 is an exemplar Capital One KAE Amendment. This document is integral to Plaintiffs' factual claim that the Capital One KAE Amendment contains material

differences from the Chase KAE Amendment—a crucial underpinning of the SAC—and shall be considered;

- Exhibit 5 is a transcript of the fairness hearing in *Kardonick v. J.P. Morgan Chase & Co*. *See* Transcript of Fairness Hearing, No. 1:10-cv-23235, (S.D. Fla. Sept. 9, 2011), ECF No. 433. The transcript may be considered as evidence that given statements were made in the hearing, but not as evidence of the veracity of any of those statements. *See S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd*., 181 F.3d 410, 426 (3d Cir. 1999).

- Exhibit 6 is a copy of the *Kardonick* Settlement Agreement which was submitted by Defendants as Exhibit K.

    At oral argument, Plaintiffs presented a set of demonstrative exhibits:

- Demonstrative Exhibits 1, 3, 5, 6, and 8 were Cardmember Agreements and KAE Amendments which are already before the Court as exhibits attached to the parties' briefs;

- Demonstrative Exhibits 2 and 7 are declarations submitted in other cases in federal court. While the Court may take judicial notice that these declarations exist on the docket of another court, it cannot consider the factual assertions within the declarations at this stage. *See S. Cross Overseas Agencies, Inc*., 181 F.3d at 426.

- Demonstrative Exhibit 4 is a federal statute and Demonstrative Exhibit 9 is a publicly available opinion from the United States District Court for the Eastern District of New York, both of which may be considered by the Court as legal authority.

    In sum, while the Demonstrative Exhibits include material already before the Court or which may be considered as legal authority, the Demonstrative Exhibits do not present any additional factual material that the Court may consider at this juncture.

      **B.   *Substantive Elements of Plaintiffs' Claims*[5]**

After three rounds of pleading, Plaintiffs have arrived at a two-count SAC alleging (1) a breach of the implied covenant of good faith and fair dealing, and (2) unjust enrichment. Both counts arise from Plaintiffs' enrollment in KAE (all Plaintiffs) and PrivacyGuard (Underwood

---

[5] Although Plaintiffs' opposition brief suggests an argument that federal law governs their breach of the implied covenant of good faith and fair dealing claims, Plaintiffs conceded at oral argument that state law governs their claims. It is now undisputed that all claims arising from the Capital One Cardmember Agreement are governed by Virginia law.

only).  Although the theories that support Plaintiffs' claims have been difficult to pin down thus far in this case, two distinct theories of recovery emerge from the allegations in the SAC.   One theory consists of allegations that, regardless of whether Plaintiffs' enrollment in each program was consistent with the formal terms of the relevant Cardmember Agreements and Amendments, the programs provided Plaintiffs with "little or no value" (the "No Value" theory).  Under this No Value theory, Plaintiffs claim that unilateral enrollment in these programs and/or continued billing for these programs constituted either an improper exercise of Defendants' right to impose new terms, or an instance of unjust enrichment that fall completely outside the terms of the Agreements.

Plaintiffs' other theory of recovery emerges from their allegations that, regardless of whether the products were lawfully implemented and billed when Plaintiffs' Cards were issued by Chase, any legal authorization for the programs was not assigned to Capital One (the "No Authorization" theory).  Under the No Authorization theory, Plaintiffs argue, Defendants' continued billing of Plaintiffs for KAE and PrivacyGuard after the Capital One Cardmember Agreement took effect was either a breach of the implied covenant of good faith and fair dealing arising from Defendants' improper exercise of the right to impose new terms, or were acts that fell completely outside the Capital One Cardmember Agreement and by which Defendants were unjustly enriched.  The two theories of recovery suggested by the SAC are not mutually exclusive (*i.e.*, KAE and/or PrivacyGuard could have been both worthless and unauthorized); however, the Court shall analyze the No Value and No Authorization theories separately to clarify which aspects of the SAC adequately support a claim at this stage.

### 1.   Breach of the Implied Covenant of Good Faith and Fair Dealing

Although "Virginia law on the implied duty of good faith and fair dealing is not exceptionally clear," the United States Court of Appeals for the Fourth Circuit "has consistently held that Virginia does recognize an implied duty of good faith and fair dealing in common law contracts." *Stoney Glen, LLC v. S. Bank and Trust Co.*, 944 F. Supp. 2d 460, 465 & n.6 (E.D. Va. 2013) (collecting federal cases applying Virginia law). To the extent that Virginia recognizes good faith and fair dealing claims, such claims are classified as breach of contract claims, not tort claims. *Id.* (citing *Charles E. Brauer Co., v. NationsBank of Va., N.A.*, 466 S.E.2d 382, 385 (Va. 1996). The claim requires proof of: (1) the existence of a contract between the parties; and, (2) a breach of the implied covenant. *Id.* at 466. This breach may occur in two ways: "(1) where a party has a clear contract right, even if its exercise would arguably be arbitrary, that party is only forbidden from acting dishonestly," *id.* (citing *Charles E. Brauer*, 466 S.E.2d at 386)); and (2) "where a party has discretion in performance, that party cannot act arbitrarily or unfairly." *Id.* (citing *Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 156 F.3d 535, 542 (4th Cir. 1998)).

### a.   Good Faith and Fair Dealing: KAE No Value Theory

Plaintiffs' No Value KAE theory rests on the allegation that Defendants enrolled them in KAE without their express permission. Although the Capital One Cardmember Agreement grants Capital One "the right to change the terms of this Agreement for any reason, and in any respect, by adding, deleting or modifying any provision[,]" SAC Ex. 2 at 2:2, Plaintiff asserts that Defendants' unilateral enrollment of them into a program with "little or no value" breached Defendants' duty to exercise their contractual rights fairly and in good faith. The SAC contains allegations that KAE customers were seldom awarded benefits, and that it is difficult to

successfully file a KAE benefit claim or cancel enrollment in KAE.  Based on these allegations, a reasonable fact finder could conclude that unilaterally enrolling Plaintiffs in a difficult-to-cancel program that would not likely provide a meaningful benefit was a breach of the implied covenant of good faith and fair dealing.  Thus, Plaintiffs' KAE No Value theory survives this motion to dismiss.

### b.  Good Faith and Fair Dealing: KAE No Authorization Theory

Plaintiffs' KAE No Authorization theory arises from the allegation that, regardless of whether KAE has any value, there was no legal authorization for Defendants to bill Plaintiffs for KAE after the Capital One Cardmember Agreement was issued.  In seeking dismissal of Plaintiffs' KAE No Authorization claims, Defendants argue that the Chase KAE Amendment modified the Chase Cardmember Agreement, which was then assigned to Capital One in its entirety.  If the Chase KAE Amendment was incorporated into a cardmember agreement that was then assigned to Capital One, Defendants argue, these documents demonstrate that there was, in fact, contractual authorization for Defendants to charge for KAE.

Plaintiffs counter first that the lack of an assignment provision in the Chase KAE Amendments prevents it from being assigned to Capital One.  Second, they argue that the Capital One Cardmember Agreement constituted an entirely new contract between Plaintiffs and Defendants, superseding all prior agreements and not incorporating any prior amendments. Finally, they argue that even if, in general, the Chase KAE Amendment could be assigned to Capital One, the KAE terms Capital One sought to impose contain changes that were adverse to Plaintiffs and thus could not be implemented without notice to Plaintiffs.  An analysis of these arguments follows.

### i.      Assignment of Accounts to Capital One

At this juncture, it cannot be disputed that Chase assigned Plaintiffs' Accounts to Capital One in April 2011.  The assignment is clearly described on the first page of the Private Label Agreement.  The legal effects of the assignment of a contract are well established.  As the Third Circuit has noted "absent a provision stating otherwise, assignment of a contract will result in the assignee stepping into the shoes of the assignor with regard to the rights that the assignor held." *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F. 3d 44, 60 (3d Cir. 2001). This principle applies with equal force to contracts governed by Delaware law (*i.e.*, the Chase Cardmember Agreement and KAE Amendment) and contracts governed by Virginia law (*i.e.*, the Capital One Cardmember Agreement and KAE Amendment).  *See Reserves Dev. LLC v. Crystal Props., LLC*, 986 A.2d 362, 370 n.24 (Del. 2009) (recognizing a party's general ability to assign contract rights); *Kelly Health Care, Inc. v. Prudential Ins. Co. of Am., Inc.*, 309 S.E.2d 305, 379 (Va. 1983) (noting that a contract interest is the proper subject of an assignment). Thus, Capital One stood in Chase's shoes on its purchase of the Accounts from Chase with respect to all rights associated with those Accounts.  This would include not only the rights established by the Chase Cardmember Agreement itself, but also any right derived from amendments thereto—including the Chase KAE Amendment.  Plaintiffs protest that the Chase KAE Amendment did not include a provision expressly authorizing assignments.  But no express advance authorization of assignment is necessary.  So long as an assignment would not materially change another parties' rights or risks, an assignment is permitted unless forbidden by statute, public policy, or the contract itself.  *See* Restatement (Second) of Contracts § 317 (1981); *Cf. Reserves Dev.*, 986 A.2d at 370.  Plaintiffs have cited no authority suggesting that any of

17

these exceptions apply with respect to the assignment of the Accounts to Capital One, including Chase's KAE-related rights.

### ii.    Issuing of the Capital One Cardmember Agreement

Plaintiffs argue that even if Capital One assumed from Chase its rights under the pre-existing Cardmember Agreement and Amendments, the Capital One Cardmember Agreement constituted an entirely new agreement that superseded the terms of prior agreements.  In support of this argument, Plaintiffs rely on case law concerning contract modification.  Differences between the Chase and Capital One Cardmember Agreements, they argue, constitute a change in terms requiring Plaintiffs' consent.  Absent such consent, Defendants had no authorization to charge for KAE following implementation of the Capital One Cardmember Agreement.  But this argument again ignores the basic legal effects of the assignment to Capital One.  Even if the Defendants could not implement *new* KAE terms without obtaining Plaintiffs' assent, they were permitted to continue exercising their rights under the existing KAE Amendment unless a subsequent document specifically extinguished that right.  Indeed, by the express terms of the Chase KAE Amendment, Capital One was *required* to continue the KAE program unless Plaintiffs were given notice of cancellation.

Plaintiffs seek to circumvent this conclusion by reference to the substitute credit card provisions of the Truth in Lending Act (TILA).  *See* 15 U.S.C. § 1642.  They argue that because the Capital One Cardmember Agreement was accompanied by a "substitute credit card"—as defined by the TILA—any  rights previously established by an agreement between Plaintiffs and Chase were no longer effective.   The argument is unavailing.  More specifically, TILA provides that it is precisely because such cards replace an "accepted" credit card, rather than create a new credit account, that banks are permitted to issue them unilaterally.  *See* 15 U.S.C. § 1642

18

(exempting "the issuance of a credit card in renewal of, or in substitution for, an *accepted* credit card" from the prohibition on unsolicited issuing of credit cards) (emphasis added); *see also* 12 C.F.R. pt. 226 Supp. I ¶ 12(a)(2)-3 ("Substitution also occurs when a successor card issuer replaces the original card issuer (for example, when a new card issuer purchases the accounts of the original issuer and issues its own card to replace the original one).").  In sum, the Capital One Cardmember Agreement did not extinguish the pre-existing Chase KAE Amendment that was assigned to Capital One in April 2011, and the fact it was issued along with a substitute credit card does not disturb this conclusion.

### iii.   Implementation of Capital One KAE Amendment

Plaintiffs' further challenge to Defendants' post-assignment authorization to bill for KAE focuses on a provision in the Chase KAE Amendment that requires the bank to provide customers with notice of any adverse changes in terms and that customers be given an opportunity to cancel their KAE service before such changes take effect.  At least one of the differences between the Chase and Capital One KAE Amendments—a change from Delaware to Virginia governing law—appears to be an adverse change in terms.  More specifically, Delaware consumer protection law does not require proof of reliance to succeed on a claim alleging deceptive practices, while Virginia consumer protection law does so require.  *Compare Pa. Emp. Benefit Trust Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 471 (D. Del. 2010) ("Courts consistently have recognized that reliance is not a required element in establishing a claim under the [Delaware Consumer Fraud Act].") (collecting cases), with *Cooper v. GGGR Invs., LLC*, 334 B.R. 179, 188 (E.D. Va. 2005) (holding that Virginia Consumer Protection Act requires proof of reliance, and collecting Virginia cases consistently reaching that result).  A change in terms which effectively adds the requirement that a customer demonstrate reliance to succeed on a

claim for deceptive practices is plainly adverse to the customer.  Thus, a change in governing law from Delaware to Virginia would have required notice to customers.  If, as Plaintiffs allege, there was no written notice of the new terms contained in the Capital One KAE Amendment, arguably those terms could not have been implemented in full when the Accounts were transferred to Capital One or when the Capital One Cardmember Agreement was issued.

While the invalidation of a single, albeit adverse, change in terms does not necessarily undermine the entire assignment of KAE to Capital One, the allegation that such provision of the Capital One KAE Amendment could not have been implemented without notice to customers raises questions that preclude dismissal of Plaintiffs' claim that Defendants lacked express authorization to charge for KAE in association with Capital One-issued cards.  Accordingly, Plaintiffs' KAE No Authorization theory adequately supports a claim for a breach of the covenant of good faith and fair dealing.

### c.   Good Faith and Fair Dealing: PrivacyGuard No Value Theory

Like her KAE-related claim, Underwood's No Value PrivacyGuard claim is based on the allegation that she was enrolled in PrivacyGuard through Defendants' improper exercise of the rights granted in section 2 of the Capital One Cardmember Agreement to unilaterally impose new Account terms.  SAC Ex. 2 at 2:2.  Underwood alleges that she did not elect to enroll in PrivacyGuard, and that, even if section 2 allows unilateral amendment on the part of Capital One, invoking this power to enroll Underwood in a program with "little or no value" breached Defendants' duty to exercise their contractual rights honestly or fairly.

Defendants' primary defense to Underwood's PrivacyGuard claims is that PrivacyGuard is not provided by Defendants, but rather was purchased by Underwood from a third party entity called Trilegiant.  This assertion is contradicted by schedule 6.4(c) to the Private Label

Agreement which is properly before the Court, must be taken as true at this stage and which provides that "Bank will offer Cardholders an identify [sic] theft protection service called 'PrivacyGuard.'"(emphasis added). Reading this provision in the light most favorable to Plaintiff leads plausibly to the conclusion that the bank—not a third party—provided PrivacyGuard.

### d. Good Faith and Fair Dealing: PrivacyGuard No Authorization Theory

The focus of Underwood's No Authorization PrivacyGuard theory is that even if she was validly enrolled in and billed for PrivacyGuard prior to April 1, 2011, any prior authorization for PrivacyGuard was no longer valid after the Capital One Cardmember Agreement was issued. As discussed *supra*, Underwood has plausibly alleged that PrivacyGuard was *never* authorized— under either the Chase or Capital One Cardmember Agreement—so it follows that she has adequately pled that Defendants' lacked authorization to charge her for PrivacyGuard under the Capital One Cardmember Agreement specifically.

In sum, both the No Value and No Authorization theories provide plausible factual support for Plaintiffs' good faith and fair dealing claims with respect to both KAE and PrivacyGuard. Therefore, these claims shall not be dismissed, except to the extent that they are time barred, precluded, or preempted.

### 2. Unjust Enrichment

For Plaintiff's claim for unjust enrichment to be sustainable the SAC and pertinent documents must contain plausible factual support for the conclusion that, without a contract governing KAE and/or Privacy Guard: (1) Plaintiffs paid Defendants for KAE and/or PrivacyGuard; (2) Defendants knew of the payment and should reasonably have expected to

provide a benefit in exchange; and (3) Defendants did not provide a benefit in exchange for the payment.  *See Schmidt v. Household Fin. Corp., II*, 661 S.E.2d 834, 838 (Va. 2008).

### a.   Unjust Enrichment: KAE No Value Theory

Defendants argue that Plaintiffs' unjust enrichment claim is foreclosed by the existence of the Capital One Cardmember Agreement.  With respect to Plaintiffs' KAE No Value theory, this argument prevails.  Regardless of whether KAE had any value, any KAE Amendment incorporated into the Capital One Cardmember Agreement would constitute an express contract concerning KAE, and an unjust enrichment claim based on the No Value theory concerning KAE would be precluded by such an Amendment.  *See Lion Assocs., LLC, v. Swiftships Builders, LLC*, 475 F. App'x 496, 503 (4th Cir. 2012) (not precedential) (citing *Mongold v. Woods*, 677 S.E.2d 288, 292 (Va. 2009) (unjust enrichment claim available only in the absence of an express agreement concerning the services giving rise to the claim).

### b.   Unjust Enrichment: KAE No Authorization Theory

An express contract only bars an action for unjust enrichment if the contract governs the services or payments giving rise to the claim.  Plaintiffs' No Authorization theory is based on the allegation that there was no contractual authorization for KAE.  In the absence of a valid KAE Amendment—an allegation that must be taken as true at this stage—it is reasonable to conclude—based on the allegations and documents under consideration here—that Plaintiffs were billed but did not actually receive KAE services in exchange for the payments retained by Defendants.  Accordingly, Plaintiffs have stated a KAE-related unjust enrichment claim based on their No Authorization theory.[6]

---

[6] While Plaintiffs' unjust enrichment claim is inconsistent with their good faith and fair dealing claim, Plaintiffs need not pick which of these inconsistent claims to pursue at this juncture.  See Fed. R. Civ. P. 8(d)(3) ("A party may state as many claims or defenses as it has, regardless of consistency").  Determining whether any allegedly unauthorized charges were the result of an improper exercise of the contractual right to impose new terms, or rather

### c. Unjust Enrichment: PrivacyGuard No Value and No Authorization Theories

Similarly, there is no express contractual bar to Underwood's PrivacyGuard unjust enrichment claim under either the No Value or the No Authorization theory.   Nothing in the Capital One Cardmember Agreement—or any document before the Court at this juncture—sets out the terms of PrivacyGuard or demonstrates that Underwood enrolled in PrivacyGuard. Underwood has pled that she paid PrivacyGuard premiums for several years, that Defendants called her seeking remittance for late payments arising from PrivacyGuard fees, and that she never received any credit monitoring notices, credit report updates, or any other PrivacyGuard services.  In other words, her allegations are that she paid Defendants for a benefit that she never received—precisely the factual predicate for an unjust enrichment claim.  Furthermore, Underwood alleges that Defendants failed to obtain authorization to access her credit reports, and thus could not have provided any credit monitoring services during the time they were charging her for PrivacyGuard.  SAC ¶ 43.  While Defendants assert that Underwood did, in fact, provide such authorization, the Court is required on this motion to dismiss to construe the facts in the light most favorable to Underwood which construction leads to the conclusion that her claim for unjust enrichment on a theory that PrivacyGuard had no value is viable.  The same result pertains to Plaintiff's PrivacyGuard No Authorization Theory.  Construing the facts and drawing all reasonable inferences from the allegations and pertinent documents, Underwood's claim that Defendants lacked authorization to charge her for PrivacyGuard is plausible.

---

fell entirely outside the Capital One Cardmember Agreement, is a fact-intensive inquiry properly reserved for a later stage in litigation.

### C. *Statute of Limitations*

Defendants argue that Plaintiffs Gordon's and Underwood's claims are time barred. The parties agree that both causes of action pled by Plaintiffs are governed by Virginia's three-year statute of limitations. *See Belcher v. Kirkwood*, 383 S.E.2d 729, 730 (Va. 1989) (three-year statute of limitations for unjust enrichment); *Corinthian Mortg. Corp v. ChoicePoint Precision Mktg.*, No. 1:07-cv-832, 2008 WL 2776991, at *5 (E.D. Va. July 14, 2008) (applying Virginia's three-year statute of limitations for unwritten contracts to a breach of the implied covenant of good faith and fair dealing claim). The original Complaint, asserting both of the claims that now appear in the SAC, was filed on February 13, 2015.

Defendants' time-bar argument rests on the assertion that Plaintiffs' claims accrued at a single time, when each Plaintiff was first billed for KAE and/or PrivacyGuard. Since both Plaintiffs were first billed for KAE (and PrivacyGuard in Underwood's case) more than three years before the original Complaint was filed in this case, claims accruing upon the first instance of billing would be time barred. Plaintiffs counter Defendants' position by arguing that a separate claim accrued at each instance of allegedly improper billing for KAE and/or PrivacyGuard.

Whether a claim based on Virginia law accrues at a single time, at the moment of the initial wrongful act, or instead a new claim accrues separately with each iteration of the wrongful act depends on the specific nature of the wrongful act and the harm it causes. *See Jones v. Morris Plan Bank of Portsmouth*, 191 S.E. 608, 609-10 (Va. 1937);[7] *see also Hunter v. Custom*

---

[7] Defendants argue that *Jones* established a rule against breaking contract suits into separate causes of action. This is inaccurate. The cited passage in *Jones* provides, "*If* a transaction is represented by one single and indivisible contract and the breach gives rise to one single cause of action, it cannot be split into distinct parts and separate actions maintained for each." *Jones*, 191 S.E. at 609 (emphasis added). In other words, *Jones* merely stands for the proposition that *if* a wrongful action gives rise to a single breach, it cannot be broken into separate causes of action. With respect to the initial claim division question, "[o]ne of the principal tests in determining whether a demand is

*Bus. Graphics*, 635 F. Supp. 2d 420, 431 (E.D. Va. 2009) ("A survey of Virginia case law indicates that the answer to [the question of whether a claim accrues once or several times] depends entirely upon the nature and type of each individual transaction that supposedly constituted a breach.").  The specific test applied by Virginia courts to make this determination is set out in *Hampton Roads Sanitation District v. McDonnell*:

> If the wrongful act is of a permanent nature and one that produces all the damages which can ever result from it, then the entire damages must be recovered in one action, and the statute of limitations begins to run from the date of the wrongful act.  Conversely, when wrongful acts are not continuous but occur only at intervals, each occurrence inflicts a new injury and gives rise to a new and separate cause of action.

360 S.E.2d 841, 843 (Va. 1987) (internal quotation marks, citations, and brackets omitted).

Three claim-accrual decisions from the Virginia Supreme Court illuminate the analysis set forth in *Hampton Roads*.  In *Hampton Roads* itself, the court determined that an "original discharge of sewage in 1969 did not produce all the damages to the property.  The discharges were not continuous; instead, they occurred only at intervals.  Thus, each discharge inflicted a new injury for which [plaintiff] had a separate cause of action." *Id.* at 844.  Similarly, in *American Physical Therapy Association v. Federation of State Boards of Physical Therapy*, the court held that "each time the [defendant] imposed a new fee" in violation of the contract at issue, "a new injury occurred and a separate cause of action accrued."  628 S.E.2d 928, 930 (Va. 2006).  In both *Hampton Roads* and *American Physical Therapy*, the alleged wrongful acts occurred at discrete intervals, and the injury from each act could be attributed to specific iterations of the wrongful conduct.  On the other hand, in *Westminster Investing Corp. v. Lamps Unlimited, Inc.*, the court held that a landlord's ongoing failure to enforce hours of operations restrictions in a commercial lease accrued at a single time when the landlord first failed to

---

single and entire, or whether it is several, so as to give rise to more than one cause of action, is the identity of the facts necessary to maintain the action."  *Id.* at 609-10.

enforce the policy, because the breach was continuous and did not consist of separate wrongful acts. 379 S.E.2d 316, 318 (Va. 1989). The question of whether any of Plaintiff's claims, under any of their theories of recovery, are time-barred is evaluated with these precedents in mind.

### 1.  Good Faith and Fair Dealing: No Value Theory

The claim accrual issue presented by Plaintiffs' No Value good faith and fair dealing claim matches closely with the scenario presented in *American Physical Therapy*.[8] In that case, the Virginia Supreme Court considered whether each of three allegedly improper fee increases in a contract between a professional association and the administrators of a state licensing exam constituted three separately accrued causes of action for breach of contract. *Am. Physical Therapy*, 628 S.E.2d at 930. The court held that they did; "each time the Federation imposed a new fee, a new injury occurred and a separate cause of action accrued." *Id.*

Plaintiffs and Defendants both argue that *American Physical Therapy* supports their respective positions. Plaintiffs argue that the case stands for the proposition that each iteration of an improperly charged fee gives rise to a separate cause of action. Defendants counter that *American Physical Therapy* must be understood to have found that a separate breach occurred only at the instances in which the fee was changed in violation of the contract, but not each time the improperly raised fees were charged. The precise accrual issue presented here—whether each <u>billing</u> following the improper implementation of a fee is a distinct claim—was not

---

[8] Plaintiffs' claim-accrual argument relies primarily on case law concerning the accrual of a right to sue to recover payment under an installment contract. *See Am. Inn, L.P. v. Wolf*, 28 F. App'x 316, 320-21 (4th Cir. 1976) (not precedential) ("'[W]e note that Virginia does follow the majority rule recognizing contracts for installment payments are divisible, thereby permitting separate actions to be maintained to recover installment payments as they fall due.'") (quoting *tenBraak v. Waffle Shops, Inc.*, 542 F.2d 919, 924 n.6 (4th Cir. 1976) (citing *Jones*, 191 S.E. at 608)); *see also Williams v. Matthews*, 48 S.E. 861 (Va. 1904) (holding that statute of limitations on claim to recover unpaid installments of stock subscriptions ran from dates on which unpaid installments were due). These cases are of limited use in resolving the specific claim-accrual issues currently before the Court. The wrongful acts alleged by Plaintiffs' claims in this case (*i.e.*, improper enrollment and improper billing without authorization) are of a different type than the breach arising from a failure to make installment payments. The facts presented in *American Physical Therapy* thus provide a better analytical match for this case.

addressed in *American Physical Therapy*, but the opinion's reasoning most closely supports Defendants' position with respect to the No Value claims. Specifically, the breach identified by the court in *American Physical Therapy* was an increase in the test fee in a manner inconsistent with the fee provisions in the contract between the parties. *Id.* at 930. Thus, while damages may have accrued each time an applicant paid the improperly increased fee, the *wrongful acts* constituting the breaches occurred only at the time of the three distinct fee increases. *Id.* This is consistent with the emphasis in *Hampton Roads* on whether the "wrongful acts" giving rise to a claim are continuous or separate. *See Hampton Roads*, 360 S.E.2d at 843.

Under Plaintiffs' No Value theory, their alleged good faith and fair dealing claim is based on the allegation that the KAE program in which Plaintiffs were enrolled was worthless. In other words, the No Value theory focuses on the lack of value provided by the program as a whole, not whether Defendants had authority to bill Plaintiffs for it each time it was charged. KAE's alleged worthlessness was an ongoing manifestation of the initial enrollment. Thus, unilateral *enrollment* in a worthless program is the crucial wrongful act at the heart of the No Value theory. Accordingly, under the No Value theory, Plaintiffs' good faith and fair dealing claims accrued only when Defendants first enrolled Plaintiffs in KAE. With respect to Plaintiffs Gordon and Underwood, this occurred, at the latest, in April 2011 when Capital One began billing them for KAE and Privacy/Guard, and possibly as early as Plaintiffs' initial enrollment in KAE and PrivacyGuard under the Chase Cardmember agreement. In either case, these good faith and fair dealing claims based on the No Value theory accrued prior to February 13, 2012 and are thus time barred.[9]

## 2.   Good Faith and Fair Dealing: No Authorization Theory

---

[9] As Defendants concede, Tantlinger's Account was deactivated for several years and her operative enrollment in KAE did not occur until March 2012—within the three-year statute of limitations—thus her No Value good faith and fair dealing claim survives.

Plaintiffs' No Authorization theory rests on the allegation that Plaintiffs were not validly enrolled in KAE and/or PrivacyGuard under the terms of the Capital One Cardmember Agreement.  Thus, unlike the No Value theory, which is rooted in the improper enrollment in worthless programs, the No Authorization theory complains of charges from programs in which Plaintiffs had not agree to be enrolled.  Under this theory, Defendants allegedly committed a distinct wrongful act each time they billed Plaintiffs for KAE and/or PrivacyGuard.  Since the No Authorization theory denies the existence of an underlying authorization for the products, this theory does not rest upon a continuous enrollment or other action that joins together each allegedly improper bill.  Rather, under the No Authorization theory, the allegedly improper charges were separate "wrongful acts . . . occur[ing] at intervals, [and] each occurrence inflict[ed] a new injury," thus giving rise to "a new and separate cause of action."  *Hampton Roads*, 360 S.E.2d at 843.  Accordingly, Plaintiffs' good faith and fair dealing claims based on the No Authorization theory are time barred to the extent that they arise from charges incurred prior to February 13, 2012, but are not time barred with respect to claims arising from charges after that date.

### 3.   Unjust Enrichment: No Value and No Authorization Theories

Liability for unjust enrichment requires proof that Defendants were paid by Plaintiffs and did not provide anything of value in return for that payment.  Since the elements of unjust enrichment focus on the wrongful retention of a given payment, a separate claim for unjust enrichment accrued each time Defendants' allegedly received payment without providing a benefit to Plaintiffs.  This analysis applies to both the No Value and No Authorization theories.  Accordingly, Plaintiffs' unjust enrichment claims are time barred only with respect to any payments received by Defendants prior to February 13, 2012.

28

### D.  Kardonick *Settlement Release of KAE Claims*

Defendants argue that Plaintiffs' KAE claims were released by the settlement agreement in *Kardonick v. J.P. Morgan Chase & Co.*, Case No. 1:10-cv-23235, (S.D. Fla. Dec. 21, 2010). Plaintiffs counter that their claims arise from "non-Chase" credit cards, which are excluded from the *Kardonick* Settlement Agreement and that, in any event, the *Kardonick* Settlement Agreement released only claims accruing prior to November 11, 2010.

Class action settlements have been consistently recognized as a basis for claim preclusion in the Third Circuit.  *See Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 277 (3d Cir. 2014). Depending on the specific terms of the claim release in a class settlement, this form of claim preclusion may bar future litigation of claims that were "not presented, and could not have been presented in the class action itself," and which accrued after the class settlement was executed. *Blunt*, 767 F.3d at 277.  However, determining the actual preclusive effect of a particular settlement agreement requires interpreting the meaning of the settlement agreement itself.  *See In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 366 (3d Cir. 2001) (examining the text of a class settlement agreement to determine whether it precluded claims in a subsequent litigation).  Settlement agreements, including class action settlement agreements, "are regarded as contracts and must be considered pursuant to general rules of contract interpretation."  *Blunt*, 767 F.3d at 282 n.50.

Plaintiffs' first challenge to Defendants' *Kardonick* preclusion argument—that Defendants are not parties to the *Kardonick* Settlement Agreement—is unavailing.  As cardholders of Chase-issued Kohl's-branded credit cards who were billed for KAE between September 1, 2004 and November 11, 2010, Plaintiffs are members of the *Kardonick* class.  And, while Plaintiffs' appear to argue that Defendants here are not parties to the *Kardonick* Settlement

Agreement because Plaintiffs' Cards are no longer literally "Chase" Cards, it is undisputed that Plaintiffs' Accounts were Chase Accounts at the time the *Kardonick* Settlement Agreement was executed, and the Agreement's definition of "Released Parties" includes Chase's "assigns." Defs.' Mot. Ex. E § II(kk).  Even without this specific provision, Chase's right to enforce the preclusive effect of the *Kardonick* Settlement Agreement would be among the rights assigned to Capital One when the Accounts were transferred, and Plaintiffs have provided no legal authority to suggest otherwise.  More generally, Plaintiffs have not explained why released claims would be revived when one party subsequently assigns its rights to a third party.  Thus, Capital One stands in Chase's shoes for the purposes of the *Kardonick* Settlement Agreement, and Defendants may enforce any claim preclusion effects of the *Kardonick* Settlement Agreement with respect to Plaintiffs' Accounts.

The fact that the *Kardonick* Settlement Agreement applies to Plaintiffs' Accounts does not, however, resolve whether the Plaintiffs' claims in this case were among those released.  To answer that question, it is necessary to examine the specific parameters of Released Claims in the *Kardonick* Settlement Agreement, which provides that.

> any and all Claims, which the [class members] ever had, now have, or may have in the future, arising out of or in any way relating to (i) any act, omission, event, incident, matter, dispute, or injury regarding a Payment Protection Product, including, without limitation, the procedures, disenrollment procedures, or administration of such a product, that took place on or before [November 11, 2010]; (ii) any acts or omissions that were raised or could have been raised within the scope of the facts asserted in the [class action complaint] or the Litigation; or (iii) any event, matter, dispute, or thing that in whole or in part, directly or indirectly, relates to or arises out of said events specified in (i) of (ii) of this paragraph.

Defs.' Mot. Ex. E §II(jj).

Defendants argue that the *Kardonick* settlement released all KAE-related claims arising from KAE accounts that were enrolled prior to November 11, 2010.  Plaintiffs, on the other

hand, argue that the *Kardonick* settlement released only claims which arose from specific wrongful acts occurring prior to November 11, 2010.  Both parties have proffered a reasonable interpretation.  Plaintiffs' position is reasonably supported by the first clause which establishes that claims relating to "any act, omission, event, incident, matter, dispute, or injury" occurring prior to November 11, 2010 are released.  On the other hand Defendants' find reasonable support for their interpretation in the clause which includes any claim that "relates to or arises out of" the specific antecedents described in the first clause.  Since all inferences must be resolved in Plaintiffs' favor when considering a motion to dismiss, the Court must adopt Plaintiffs' proposed interpretation of the *Kardonick* Settlement Agreement for the purposes of the current motion.  Accordingly, only those claims which accrued prior to November 11, 2010 (which are also time barred) are precluded by the *Kardonick* claim release.

### E.  *National Bank Act Preemption*

Defendants argue that Plaintiffs' KAE claims are preempted by the National Bank Act (NBA).  This argument must be viewed in the context of the Supreme Court's consistent holdings that the NBA's preemptive scope "leaves in place some state substantive laws affecting banks."  *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 529 (2009).  Specifically, the NBA leaves in place state laws that do not "forbid, or to impair significantly, the exercise of a power that Congress explicitly granted" to national banks.  *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996).  Thus, "states are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's . . . exercise of its powers."  *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 12 (2007).  For example, "contracts made by national banks 'are governed and construed by State laws,'" so long as "such laws do not conflict with the letter or the general purposes of the NBA."  *Id.* at 11

(quoting *Nat'l Bank v. Commonwealth*, 76 U.S. (9 Wall.) 353, 361 (1870)).  The reservation of

states' power to apply their laws of general applicability to national banks was reaffirmed by the

NBA preemption provisions of the Dodd-Frank Wall Street Reform and Consumer Protection

Act (the "Dodd-Frank Act"), Pub. L. No. 111-203, 124 Stat. 1376 (2010) (NBA preemption

provisions codified at 12 U.S.C. § 25b).[10]

### 1.  KAE Claims Against Kohl's

Defendants argue that the NBA preempts Plaintiffs' KAE claims against Kohl's, which is

not a national bank, because Kohl's serviced the Accounts of behalf of Capital One, and thus was

acting as the agent of a national bank.  In so arguing, Defendants rely on case law derived from

the Supreme Court's decision in *Watters v. Wachovia Bank, N.A*, 550 U.S. 1 (2007), which held

that the NBA preempted state-law claims against the non-national bank subsidiaries of national

banks, if such claims would significantly impair the national banks' ability to carry out their

authorized banking activities.  The First and Second Circuits extended this subsidiary-

preemption holding from *Watters* to find NBA preemption of claims against non-bank third

parties acting as agents for national banks.  *See Pac. Capital Bank N.A. v. Connecticut*, 542 F.3d

341, 353 (2d Cir. 2008) (extending the holding in *Watters* to apply NBA preemption to claims

against tax preparers soliciting tax refund anticipation loans on behalf of a national bank);

*SPGGC, LLC v. Ayotte*, 488 F.3d 525, 533 (1st Cir. 2007) (extending the holding in *Watters* to

apply NBA preemption to claims against a shopping mall operator offering gifts cards on behalf

---

[10] The NBA preemption provision of the Dodd-Frank Act, which took effect July 21, 2011, specifies that laws
governing the "manner, content, or terms and conditions of any financial transaction . . . or any account related
thereto" are not preempted as applied to national banks unless (A) the state law would "have a discriminatory effect
on national banks, in comparison with the effect of the law on a bank chartered by that State"; (B) the state law
would be preempted under the standard set forth in *Barnett Bank of Marion County v. Nelson*; or (C) the state law is
preempted by a federal law other than the NBA.  12 U.S.C. 25b(b)(1).  The Dodd-Frank Act further clarified that the
NBA "does not occupy any field in any area of State law."  12 U.S.C. 25b(b)(4).

of a national bank).  Citation to these cases omits consideration of a subsequently enacted

provision of the Dodd-Frank Act which provides that:

> No provision of title 62 of the Revised Statutes or section 371 of this title shall be construed as preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or agent of a national bank (other than a subsidiary, affiliate, or agent that is chartered as a national bank).

12 U.S.C. § 25b(h)(2).[11]  In preparation for the implementation of the Dodd-Frank Act, the

Office of the Comptroller of the Currency ("OCC")[12] issued an interpretive letter which noted

that "[t]he Act eliminates preemption of state law for national bank subsidiaries, agents and

affiliates."  John Walsh, OCC Interpretive Letter No. 1132, 2011 WL 2110224 (May 12, 2011)

(citing Dodd-Frank Act §§ 1044(a), 1045 (codified at 15 U.S.C. § 25b)).  Thus, by the plain

language of the statute, and in accordance with the OCC's interpretation, the Dodd-Frank Act

effectively overturned the subsidiary-preemption holding in *Watters*.  *See Miss. Dep't of Revenue

v. Pikco Fin., Inc.*, 97 So. 3d 1203, 1209 n.7 (Miss. 2012) ("The Dodd-Frank Act . . . overturned

judicial precedent like *Watters* and rescinded preemption of state law as to national bank

subsidiaries and affiliates.") (citing 12 U.S.C. § 25b; OCC Interpretive Letter No. 1132).[13]

The pre-Dodd-Frank application of *Watters*'s subsidiary-preemption holding to Plaintiffs'

claims is moot because any of Plaintiffs' claims accruing prior to the effective date of the Dodd-

Frank NBA preemption provisions are time barred.  With respect to claims arising after July 21,

---

[11] Title 62 of the Revised Statutes refers to the NBA, as codified at 12 U.S.C. §§ 16, 21, 22-24a, 25a, 26-27, 29, 35-37, 39, 43, 52, 53, 55-57, 59-62, 66, 71, 72-76, 81, 83-86, 90, 91, 93, 93a, 94, 141-144, 161, 164, 181, 182, 192-194, 196, 215c, 481-85, 501, 541, 548, 582.  *See* 12 U.S.C. § 25b (note clarifying references in text).

[12] The NBA designated the Office of the Comptroller of the Currency (OCC) within the Department of the Treasury as the agency responsible for executing federal banking law, 12 U.S.C. § 1, and specifically authorized the OCC to "prescribe rules and regulations to carry out the responsibilities of the office."  12 U.S.C. § 93a.

[13] While Defendants' provided supplemental authority in their post-argument letter brief consisting of a recent unpublished district court opinion finding NBA preemption against a non-bank, Defendants have not identified any precedential post-Dodd-Frank authority, from any jurisdiction, which specifically holds that the *Watters* subsidiary-preemption holding remains good law after the implementation of 12 U.S.C. 25b.  *Cf. Madden v. Midland Funding, LLC*, 786 F.3d 246, 247-48 (2d Cir. 2015) (applying pre-Dodd-Frank case law to claims arising prior to July 21, 2011).

2011, however, 12 U.S.C. § 25b(h)(2) expressly forecloses NBA preemption against entities that are not chartered as national banks.  Accordingly, the Court must reject Defendants' NBA preemption argument with respect to claims against Kohl's.

### 2.   KAE Claims Against Capital One

While NBA preemption is inapplicable to claims against Kohl's in light of the Dodd-Frank Act, it remains a valid consideration with respect to claims against Capital One, which is a national bank.  Defendants argue that Plaintiffs' KAE claims are preempted by 12 C.F.R. § 37 ("Part 37"), the federal regulation governing debt cancellation contracts.[14]

Part 37 contains an explicit preemption clause, which provides that "National banks' debt cancellation contracts and debt suspension agreements are governed by this part and applicable Federal law and regulations, and not by part 14 of this chapter or by State law."  12 C.F.R. § 37.1(c).[15]  The substantive provisions of Part 37 set forth a comprehensive regulatory framework governing prohibited practices (Part 37.3), refunds in the event of termination or prepayment of the loan (Part 37.4), method of payment (Part 37.5), disclosures (Part 37.6), acknowledgement requirements (Part 37.7), and safety and soundness requirements (Part 37.8).  As described by the OCC's supplementary notes to Part 37, this regulation, "together with any other applicable requirements of Federal law and regulations, [is] intended to constitute the entire framework for uniform national standards for [debt cancellation contracts] and [debt suspension agreements]

---

[14]"Federal regulations have no less pre-emptive effect than federal statutes," and the preemptive force of a federal regulation is determined by the regulation itself, not the underlying statute, unless the party opposing preemption challenges the validity of the regulation. *Fid. Fed. Sav. and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153-54 (1982).

[15] The OCC has concluded that the Dodd-Frank Act did not disturb the scope of Part 37.  *See* Office of Thrift Supervision Integration; Dodd-Frank Act Implementation, 76 Fed. Reg. 43,549, 43,558 (July 21, 2011) ("We did not propose changes to 12 C.F.R. 7.4002, 34.21, and 37.1 and therefore make no changes to these provisions in this final rule.  However, we agree with commentators that these rules remain in effect.").  Plaintiffs have not challenged the OCC's conclusion.

offered by national banks." Debt Cancellation Contracts and Debt Suspension Agreements, 67 Fed. Reg. 58,962, 58,964 (Sept. 19, 2002). In light of the explicit preemption clause, the manifest regulatory intent to preempt all state law relating to debt cancellation contracts, and the comprehensive regulatory regime set forth in Part 37, it is clear that Part 37 preempts state law claims arising from debt cancellation contracts.[16]

### i.    KAE No Value Claims

A debt cancellation contract is defined as "a loan term or contractual arrangement modifying loan terms under which a bank agrees to cancel all or part of a customer's obligation to repay an extension of credit from that bank upon the occurrence of a specified event." 12 C.F.R. § 37.2(f). While Plaintiffs have disputed in the context of this motion to dismiss that KAE is, in fact, a debt cancellation product, they are hoisted by their own petard in that they assert to the contrary in the SAC: KAE, they allege, is a product that "cancel[s] a consumer's account balance, up to a certain dollar amount, in the event of a qualifying event." SAC ¶ 36. Furthermore, both the Chase and Capital One KAE Amendments describe a product that will "cancel [a customer's] Account balance" upon the occurrence of specific qualifying events. Defs.' Mot. Ex. at 3; Pls.' Opp. Ex. 4 at 1. Thus, even drawing all inferences in Plaintiffs' favor and accepting all factual allegations in the SAC as true, the only reasonable conclusion is that KAE is a debt cancellation product, as defined by Part 37.

---

[16] Several other state and federal courts have similarly concluded that Part 37 preempts the field of debt cancellation contracts. *See New Mexico v. Capital One Bank (USA) N.A.*, 980 F. Supp. 2d 1314,1327 n.6 (D.N.M. 2013) (noting that "the field of debt cancellation contracts and debt reduction agreements has been preempted"); *Denton v. Dep't Stores Nat'l Bank*, No. 10-cv-5830, 2012 WL 1204940, at *4 (W.D. Wash. Apr. 11, 2012) ("The [National Bank] Act preempts Plaintiff's claim for breach of the covenant of good faith and fair dealing.") (citing 12 C.F.R. § 37.1(c)); *Rose v. Bank of Am. Corp.*, No. 10-cv-5067, 2010 WL 8435397, at *4 (C.D. Cal. Nov. 5, 2010) ("[T]he Court finds that Plaintiff's state law claims are barred by field preemption."); *Spinelli v. Capital One Bank*, 265 F.R.D. 598, 605 (M.D. Fla. 2009) ("[T]he Court determines that field preemptions also applies because the OCC's comprehensive scheme of regulation leaves no room for state law when it comes to Debt Agreements."); *Thomas v. Bank of Am. Corp.*, 711 S.E.2d 371, 375 (Ga. Ct. App. 2011) (finding both explicit and implied field federal preemption of law governing debt cancellation contracts).

Plaintiffs' KAE No Value claims rest on the allegation that KAE, which is defined by the terms of a debt cancellation contract, is substantially a worthless product. This type of claim falls squarely within the domain of state law that is preempted by Part 37. Thus, Plaintiffs' KAE-related claims based on the No Value theory of recovery are preempted by Part 37 and must be dismissed.[17]

### ii.   KAE No Authorization Claims

Plaintiffs' No Authorization claims do not arise from a KAE contract, but rather are based on the theory that, at least after the assignment of Plaintiffs' Accounts to Capital One, there was no authorization for the KAE fees that Plaintiffs were charged. Since such claims do not arise from a debt cancellation agreement, but rather allege that no such agreement was authorized, they are not preempted by Part 37.

## IV.   CONCLUSION

In sum, all of Plaintiffs' claims arising from fees incurred (good faith and fair dealing claims) or paid (unjust enrichment) prior to February 13, 2012 are time barred and shall be dismissed. Additionally, the following claims cannot proceed against either Defendant: Plaintiffs Gordon's and Underwood's breach of the covenant of good faith and fair dealing claims based upon the No Value theory (time barred and, with respect to KAE-related claims,

---

[17] Defendants have also argued that Plaintiffs' KAE-related claims are preempted by 12 C.F.R. § 7 ("Part 7"), based on the theory that KAE fees are "interest" for Part 7 purposes. But KAE is not an extension of credit, so payments for KAE are not "payment[s] compensating a creditor or prospective creditor for an extension of credit, making available of a line of credit, or any default or breach by a borrower." 12 C.F.R. § 7.4001(a) (defining "interest"). In fact, Part 37's anti-tying provisions expressly prohibit a bank from making a debt cancellation contract a prerequisite for the extension of credit. *See* 12 C.F.R. § 37.3(a). Furthermore, the OCC has justified fees for debt cancellation contracts by pointing to the provision in Part 7 which allows national banks "to establish *non-interest* charges and fees." Debt Cancellation Contracts and Debt Suspension Agreements, 67 Fed. Reg. 58,962, 58,694 (Sept. 19, 2002) (quoting 12 C.F.R. § 7.4002(a)) (emphasis added). Thus, a straightforward interpretation of "interest," consistent with the OCC's own commentary concerning debt cancellation contract fees, leads to the conclusion that KAE fees are not interest. *See Hood ex rel. Mississippi v. JP Morgan Chase & Co.*, 737 F.3d 78, 90-92 (5th Cir. 2014) (suggesting that payment protection plan fees are not interest); *see also Hawaii ex rel. Louie v. HSBC Bank Nev., N.A.*, 761 F.3d 1027, 1035 (9th Cir. 2014) ("Like the Fifth Circuit and the OCC, we doubt that payment protection plan fees are interest."). Accordingly, Part 7 does not preempt Plaintiffs' KAE claims.

released in the *Kardonick* Settlement Agreement); and all Plaintiffs' KAE-related unjust enrichment claims based on the No Value theory (foreclosed by the existence of an express contract).  Additionally, all three Plaintiffs' KAE-related breach of the covenant of good faith and fair dealing claims based upon the No Value theory cannot proceed against Capital One because they are preempted by 12 C.F.R. § 37.

Dated:  March 28, 2016

                                        **BY THE COURT:**

                                        **/S/WENDY BEETLESTONE, J.**

                                        _____

                                        **WENDY BEETLESTONE, J.**