**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JENNIFER GORDON, VALERIE TANTLINGER, and JENNIFER UNDERWOOD, | CIVIL ACTION |
| Plaintiffs, | |
| v. | NO. 15-730 |
| KOHL'S DEPARTMENT STORES, INC., and CAPITAL ONE, NATIONAL ASSOCIATION, | |
| Defendants, | |

## OPINION

Plaintiffs Jennifer Gordon, Valerie Tantlinger, and Jennifer Underwood have brought this putative class action against Defendants Kohl's Departments Stores, Inc. ("Kohl's") and Capital One, National Association ("Capital One"), claiming that Defendants improperly charged for two worthless "enhancement products" associated with their Kohl's-branded credit card accounts. They claim a breach of the implied covenant of good faith and fair dealing in their Cardmember Agreements, on the theory that charging for the enhancement products was an arbitrary or unreasonable exercise of Defendants' rights under that agreement. They contend further that, even absent contract liability, the Defendants were unjustly enriched by the fees they received from Plaintiffs for the product enhancements. Defendants have filed a motion for summary judgment on all of Plaintiffs' claims. For the reasons set forth below, Defendants' motion shall be granted in part and denied in part.

## I.     BACKGROUND

The products at issue in this case – Kohl's Account Ease ("KAE") and PrivacyGuard – were offered in association with Kohl's-branded private-label credit cards ("Kohl's cards"),

which could be used only to shop at Kohl's. Since Plaintiffs' claims require analysis of each

Defendants' role in the Kohl's card program, it is necessary to describe the structure of

Defendants' relationship with each other and with customers before turning to Plaintiffs' specific

experience with their Kohl's cards and the fees at issue in this case.

## A.    Kohl's Private-Label Credit Card Program

Kohl's is a nationwide department store chain based in Wisconsin, which has offered

Kohl's cards for more than 50 years. J.A. 800. Since 2006, Kohl's itself has not issued Kohl's

cards or owned the credit accounts associated with the cards, but instead has partnered with large

national banks. From 2006 to 2011, the cards were issued and the accounts were owned by

Chase Bank USA, N.A. ("Chase"). J.A. 800. From 2011 onwards, Capital One has served that

function. J.A. 800.

### 1.    Ownership by Chase (2006-2011)

From April 2006 through March 2011, the structure of the Kohl's card program was

governed by a private-label agreement between Chase and Kohl's (the "Chase Private-Label

Agreement"), which provided that Kohl's would service the accounts on Chase's behalf and

share in the profits from fees associated with the cards. J.A. 800. Customers who opened an

account during this time completed an application that included a Cardmember Agreement (the

"Chase Cardmember Agreement") which described Chase as the card issuer and owner of the

account, Kohl's as the servicer on behalf of Chase, and set forth the terms and conditions of the

account. J.A.18. Among those terms was a "Governing Law" clause providing that the

Cardmember Agreement and accounts were governed by federal law and "to the extent state law

applies, the law of Delaware, without regard to choice-of-law principles. The law of Delaware,

where your account is located and we are located, will apply no matter where you live or use the

account." J.A. 19. The Chase Cardmember Agreement also provided that "We may add or delete a term or change any term of the Agreement . . . by furnishing you notice of the change in the manner required by applicable law." J.A. 18.[1] The Chase Cardmember Agreement also provided that Chase could assign "your Account, any amounts you owe us, or any of our rights or obligations under this Agreement to a third party." J.A. 19.

Although paper applications were sometimes used, most customers completed the credit card application on point-of-sale pin pads at the check-out counters in Kohl's stores. J.A. 3. After opening their accounts at the store, customers received their cards in the mail a few weeks later and received monthly account statements bearing the Kohl's logo. J.A. 37, 490.

### 2. Transfer of Accounts to Capital One

In mid-2010, Capital One replaced Chase as the issuer of Kohl's card accounts. In August 2010, Kohl's and Capital One signed a new private-label agreement (the "Capital One Private-Label Agreement"). J.A. 104-281. Pursuant to that agreement, in April 2011 Capital One stepped into Chase's shoes as the issuer and owner of all Kohl's cards while Kohl's continued to service the accounts on Capital One's behalf. J.A. 120-23.

The Capital One Private-Label Agreement provided that several terms and conditions established by the Chase Cardmember Agreement would be changed in advance of the transfer of accounts to Capital One, including an increase in some fees and the deletion of a mandatory arbitration clause. J.A. 165. Customers were notified that these changes would take effect in October 2010 in a letter sent to all cardmembers on August 30, 2010. J.A. 1476-77.

To transition the accounts from Chase to Capital One, the two banks signed a purchase and sale agreement (the "Purchase Agreement") on March 31, 2011 which provided for a transfer of Chase's assets related to the Kohl's card accounts – including the accounts,

---

[1] "We," "us," "our," and "ours," in the Chase Cardmember Agreement refer to Chase. *Id.*

cardholder indebtedness, and Cardmember Agreements – effective April 1, 2011. In mid-2011, customers received notice of the change in ownership of their accounts from Chase to Capital One, but this notice did not include a full description of the terms and conditions of their accounts, nor did it advise customers of any changes beyond the change in ownership. J.A. 515, 818. Cardmembers did not receive a new card when Capital One assumed their accounts, but eventually received new cards from Capital One as their pre-existing Chase-issued cards were lost, stolen, or expired. J.A. 819.

### a. Capital One Ownership

Customers who opened Kohl's card accounts after April 1, 2011 received a copy of Cardmember Agreement that named Capital One as the issuer of their cards and owner of their accounts (the "Capital One Cardmember Agreement"). The Capital One Cardmember Agreement reflected the new terms implemented in October 2010, and also included a provision that designated Virginia law – rather than Delaware – as the source of state law governing the accounts. J.A. 2780. Customers who opened their Kohl's card account prior to April 1, 2011 were not sent a copy of the Capital One Cardmember Agreement unless they specifically requested it, and there is no evidence that they were ever systematically notified that their accounts were governed by Virginia law. J.A. 520.

### 3. Enhancement Products

Neither of the two enhancement products at issue in this case – KAE and PrivacyGuard – changed the core terms of the card accounts, such as interest rates or late payment fees, but instead added supplemental services. J.A. 511, 1883.

### a. Kohl's Account Ease (KAE)

KAE was a debt cancellation product first offered in 2006, shortly after Chase assumed ownership of the Kohl's card accounts.  J.A. 799.

### i. KAE Enrollment Procedures

Although customers could sign up for KAE at any time, the vast majority of KAE enrollments took place through point-of-sale pin pads during the initial Kohl's card account application process.  J.A. 536.  As customers completed their applications, they were presented with a pin pad screen that displayed, "I elect to purchase optional Kohl's Account Ease costing $1.60 per $100 of my ending monthly balance.  I received KAE benefit summary/disclosure," and prompted to either "Accept" or "Decline" KAE.  J.A. 9.  Without a response to this prompt, the card application process could not proceed.  J.A. 3.  Upon receiving an "Accept" response associated with an approved Kohl's card application, Kohl's would forward a customer's information to Assurant – the third-party "Plan Administrator" of KAE – which would then send enrolled customers a Kohl's Account Ease Plan Amendment to Cardmember Agreement ("KAE Amendment") describing the full terms and conditions of KAE.  J.A. 3.  The KAE Amendment operated as an amendment to each customer's Cardmember Agreement, and customers were not required to complete any additional steps to maintain enrollment in KAE – it became integrated in the terms and conditions of their Kohl's card accounts.  J.A. 3.

### ii. Program Benefits and Administration

Customers received notice of the express terms of KAE in two ways.  First, the in-store Kohl's card applications contained a brief description of KAE and its key terms.  J.A. 18.  Under both Chase's and Capital One's ownership, this informational text said that KAE would cancel a

customer's account balance in the event of "involuntary unemployment, disability, hospitalization, or loss of life," and cost of the program. J.A. 18, 2780.

The full terms and conditions for KAE were described in the KAE Amendment that customers received in the mail after enrolling in KAE. J.A. 420-22. The KAE Amendment elaborated on the criteria for determining if customers had experienced a qualifying involuntary unemployment, disability, hospitalization, or loss of life. J.A. 420. It also set forth the process for claiming KAE benefits: Customers first had to phone the "Plan Administrator"[2] who would then send customers written materials to submit via mail to confirm eligibility for a claim. J.A. 430. Customers who enrolled in KAE prior to April 1, 2011 were sent a version of the KAE Amendment which named Chase as the issuer of customers' accounts (the "Chase KAE Amendment") but were not sent a copy of the Capital One KAE Amendment after the transfer of their account to Capital One unless they specifically requested a copy of their KAE terms and conditions after that date. J.A. 1180. Customers who enrolled after April 1, 2011 received a KAE Amendment naming Capital One as the issuer (the "Capital One KAE Amendment"). J.A. 430, 2783.

The Chase and Capital One KAE Amendments were substantially identical, with three exceptions: (1) the Chase KAE Amendment referred to Chase as the issuer of accounts, while the Capital One KAE Amendment referred to Capital One as the issuer; (2) the Amendments listed different post office box addresses to which customers were directed to submit claims materials; and (3) the Chase KAE Amendment contained a Delaware choice of law provision, while Virginia law governed the Capital One KAE Amendment. J.A. 812. Both KAE Amendments contained a provision that permitted the card issuer to change the terms of the KAE

---

[2] The Plan Administrator was Assurant, an entity unaffiliated with either Defendant and not specifically identified in either the KAE Amendment or the Cardmember Agreement. J.A. 18-19, 430.

Amendment, with the caveat that adverse changes "will not take effect until after we have provided you with written notice and a reasonable opportunity to cancel your enrollment without penalty before the changes go into effect." J.A. 430.

Although KAE was billed to customers' Kohl's card bills and its terms were established via an agreement between customers and Chase or Capital One, during most of the program's existence the KAE program was actually administered by Assurant, a subsidiary of the American Bankers Management Company ("AMBC"). J.A. 528, 1166-67, 1172. Although the rules for claim approval were dictated by Chase (prior to April 1, 2011) and Capital One (after April 1, 2011), Assurant processed KAE benefits claims and maintained the day-to-day operations of KAE until Capital One assumed in-house administration of the program in August 2015. J.A. 528, 1172. Despite its role in administering KAE, Assurant was not mentioned in either the Cardmember Agreement or the KAE Amendment, and there was no separate KAE contract between customers and Assurant. J.A. 18, 430, 2783.

### iii. Cancellation Procedures

Customers could cancel KAE at any time by calling a designated customer service number listed in the KAE Amendment, or by calling Kohl's customer service. J.A. 426, 1496-99. At all relevant times, Kohl's maintained a policy of refunding two months' worth of KAE fees any time a customer cancelled KAE, regardless of the reason for cancellation. J.A. 564. Prior to July 2012, when a customer complained that they had never signed up for KAE but were being billed for it, Kohl's searched for evidence of the customers' initial enrollment. If it found such evidence, then it refunded only the final two months of KAE fees. If it did not, it refunded all of a customer's KAE fees (and associated interest). J.A. 1504. Beginning in July 2012, Defendants adopted a new policy by which any customer who claimed not to have enrolled in

KAE was automatically refunded all KAE fees, without an investigation into whether they had signed up. J.A. 1865.

### iv.     Informal Relaxation of KAE Terms

After acquiring the Kohl's card portfolio in 2011, Capital One became concerned that the low rate of customer utilization of KAE benefits might attract regulatory scrutiny, and Defendants developed measures to reduce the gap between fees collected for KAE and benefits paid. J.A. 1667. The primary strategy was to relax enforcement of several KAE terms. To that end, in April 2012 Capital One and Kohl's directed Assurant to process claims entirely via phone without requiring verification paperwork. J.A. 1843-45. Assurant was also directed not to enforce the 180-day deadline for filing a claim, nor to demand proof of prior employment or state unemployment benefits when processing an unemployment-based KAE claim. J.A. 1843-45. Then, in January 2014, Defendants further relaxed enforcement of KAE terms by directing Assurant not to reject disability-based KAE claims when the underlying disability had provided the basis for a prior KAE claim. J.A. 1184. Despite these systematic changes in the approval process for KAE claims, the formal terms of KAE were never modified, and customers were never informed about the relaxed protocols. J.A. 678-79. Even when calling to make a claim, a customer would not be told that certain provisions were no longer being enforced. J.A. 1843-45. Rather, the representative processing the claim would, for example, not ask for proof of prior employment to support a claim for KAE benefits based on unemployment or would ignore that a claim was outside the official time window for a hospitalization-based KAE claim. J.A. 1843-45. Although Defendants internally discussed a formal change in terms for KAE, they ultimately decided to end KAE entirely by retiring the program for all existing customers by March 2017.

### b.       PrivacyGuard

PrivacyGuard is an identity theft protection and credit monitoring product that Kohl's card customers could purchase from a third-party entity called Trilegiant through a solicitation they received from Kohl's during card-activation phone calls beginning in late 2009. J.A. 350, 1503. Unlike KAE, PrivacyGuard did not operate as a modification to the Cardmember Agreement. Instead, it was sold as a third-party product, which Kohl's allowed to be billed to Kohl's cards (as an exception to the general rule that Kohl's cards were limited to making purchases from Kohl's itself) pursuant to a marketing agreement with Trilegiant. J.A. 350. Under that marketing arrangement, Kohl's agreed to solicit enrollments in PrivacyGuard and allow payment with a Kohl's card in exchange for a portion of the proceeds from PrivacyGuard fees. J.A. 350. For their part in processing the PrivacyGuard charges, Chase and Capital One were allocated a small portion of Kohl's share of PrivacyGuard fees during the respective time period in which they owned Kohl's card accounts to which PrivacyGuard was charged. J.A. 519.

### i.       PrivacyGuard Enrollment Procedures

Although Kohl's card customers could enroll in PrivacyGuard at any time, most PrivacyGuard enrollees signed up through the interactive voice recognition ("IVR") system that processed their calls when they phoned to activate a new or replacement Kohl's card. J.A. 6, 646.[3] If a customer accepted PrivacyGuard through the IVR, their enrollment information was sent to Trilegiant, which then followed up with a welcome kit containing the full terms and conditions, including the terms of a contract for PrivacyGuard between customers and Trilegiant J.A. 362-63. Signing up for the program through the Kohl's IVR automatically triggered an initial set of benefits, including identity theft insurance, identify theft counseling, and access to

---

[3] When customers called to activate new or replacement Kohl's cards, they were presented with an automated solicitation for PrivacyGuard, which described the benefits of PrivacyGuard as well as its cost. J.A. 391.

the PrivacyGuard website. J.A. 828. A more comprehensive set of benefits – including access to full credit reports and daily credit monitoring services – were available only after customers completed a second step described in the welcome kit in which customers provided their social security number and gave explicit authorization for Trilegiant to access their credit reports. J.A. 364. While 30,000 Kohl's card customers were enrolled in PrivacyGuard by mid-2012, only 12% completed both steps of the process and obtained the full benefits of the program. J.A. 1835. Customers were charged the full price for PrivacyGuard – $2.95 for the first month and $14.99 for each month thereafter – regardless of whether they completed the second step of the activation process. J.A. 839.

## ii. Program Benefits and Administration

Trilegiant was responsible for providing all PrivacyGuard services (which could also be purchased directly from Trilegiant using any credit or debit card), and maintaining enrollment records. J.A. 417. Kohl's role with respect to PrivacyGuard consisted of soliciting initial enrollment and permitting the charges on the Kohl's card, while Chase or Capital One's role was to process the charges – as they would for any third-party purchase made on a credit card. J.A. 519. Customers who called Kohl's with questions about PrivacyGuard (other than to request cancellation) were directed to call the customer service number provided in their welcome kits from Trilegiant. J.A. 1502-03.

After assuming the Kohl's card portfolio in 2011, Capital One expressed concerns about PrivacyGuard's policies and procedures, including the two-step activation process. J.A. 808. Despite resistance from Kohl's – which was concerned about breaching its contractual obligations to Trilegiant – Defendants agreed to stop marketing PrivacyGuard to new customers in January 2012. J.A. 806. Existing customers remained enrolled until October 2013, at which

point Defendants terminated the agreement with Trilegiant and stopped billing for PrivacyGuard through Kohl's card accounts.  J.A. 662.

### iii.    Cancellation Procedures

The initial PrivacyGuard marketing pitch from Kohl's indicated that customers could "cancel at any time" and provided a specific telephone number for all PrivacyGuard-related inquiries.  J.A. 391.  The welcome kit provided by Trilegiant provided the same number, and repeated that customers could cancel PrivacyGuard at any time.  J.A. 363.  In addition, if a Kohl's customer called Kohl's customer service center and asked to cancel PrivacyGuard, Kohl's had the capacity to cancel the enrollment – although customers were referred to the PrivacyGuard-specific customer service number if they had additional questions.  J.A. 1502-03. Unlike with KAE, Defendants did not automatically refund any PrivacyGuard fees after cancellation, although fees were refunded if an investigation revealed that a customer had not signed up for PrivacyGuard.  J.A. 1504-05.

### B.    Plaintiffs' Kohl's Card Accounts

Plaintiffs in this case – Jennifer Gordon, Valerie Tantlinger, and Jennifer Underwood – are Kohl's card customers who were billed for enhancement products associated with their Kohl's cards.  All three Plaintiffs were billed for KAE, but only Underwood was charged for PrivacyGuard.

### 1.    Initial Account Opening and Enrollment in KAE

All three Plaintiffs opened their Kohl's card accounts through point-of-sale pin pads at Kohl's stores:  Tantlinger in Pennsylvania in 2007, Underwood in California in 2009, and Gordon in Pennsylvania in 2010.  J.A. 4, 490-92, 750, 776.  Although all three remember entering information into a pin pad, none recalls seeing the KAE prompt or receiving any

information about KAE.  J.A. 495.  Nevertheless, Kohl's computer system recorded a KAE enrollment for each Plaintiff corresponding to the date they opened their respective Kohl's card accounts, J.A.4, and AMBC's records indicate that each Plaintiff was sent a copy of the Chase KAE Amendment shortly thereafter.  J.A. 422, 426, 438.

Plaintiffs were charged for KAE in their first Kohl's billing cycle, and continued to be charged in every month that their Kohl's cards were owned by Chase except for Tantlinger, who paid off her entire account balance in October 2008 and stopped using her card for several years. J.A. 11-12, 14-15, 33-34.  There is no evidence that any Plaintiff attempted to cancel KAE while Chase owned their Kohl's card accounts, nor that they attempted to claim KAE benefits. Although no Plaintiff recalled seeing the KAE charges while Chase owned the accounts, none deny that KAE appeared on their monthly statements or that they regularly made payments based on those statements.  J.A. 497, 746-47, 781.

### 2.    Transfer of Accounts to Capital One

After Capital One took over the Kohl's card portfolio on April 1, 2011, Plaintiffs' monthly statements continued to reflect charges for KAE (at same rate of $1.60 per $100) and Plaintiffs continued to make payments based on those monthly statements, including Tantlinger who resumed using her Kohl's card in May 2012.  J.A. 12, 34, 37-50, 498, 781, 878-908, 933-64, 984-90.[4]  No Plaintiff recalls receiving the Capital One Cardmember Agreement or Capital One KAE Amendment or requesting a copy of those documents from Defendants after the accounts were transferred to Capital One.  J.A. 496, 753, 778.  All three Plaintiffs contend that they remained unaware of their KAE enrollment for several months, and no Plaintiff ever attempted to obtain KAE benefits from Capital One.  J.A. 497, 505, 746-47, 780, 785.

---

[4] Tantlinger acknowledges that her account was not closed between 2008 and 2012, and that the card she used from 2012 onward was associated with the account she opened in 2007.  J.A. 752.

### 3.    Cancellation of KAE

Plaintiffs claim that they began to notice KAE on their statements in 2012 and 2013, after paying for KAE for between three and four years, respectively.  Underwood was the first Plaintiff to realize she was paying for KAE.  She recalls learning of her KAE enrollment in the spring of 2012 when Kohl's contacted her about an unpaid balance on her account, arising solely from PrivacyGuard monthly charges, KAE fees, late fees, and interest that Underwood had not realized were accruing since she had not used her Kohl's card to make a purchase since paying off her entire balance early in 2012.  J.A. 785.  Upon learning of her new account balance, Underwood paid the balance in full and closed her Kohl's card account, which ended her enrollment in KAE.  J.A. 776.

Tantlinger was the next Plaintiff to realize she was enrolled in KAE.  She noticed it on a monthly statement in mid-2013.  J.A. 757.  Upon seeing the KAE charges, Tantlinger called Kohl's to complain about "unexplained" charges and learned that she was enrolled in KAE.  J.A. 747.[5]  On that call, she denied having accepted KAE and asked to cancel immediately.  J.A. 747. Her July 2013 bill reflects a refund for two months' worth of KAE fees, and Tantlinger was never again charged for KAE.  J.A. 51-68.

Gordon was the last Plaintiff to realize she was paying for KAE.  She noticed the charges on a monthly statement sometime in the last half of 2013.  J.A. 486.  She then called Kohl's to learn more about the charges, but did not ask to cancel KAE.  J.A. 505.  Although she continued to research KAE and eventually contacted legal counsel regarding the fees, Gordon never asked

---

[5] Although Tantlinger does not recall exactly which statement triggered her awareness of KAE, she remembers that it was in mid-2013 and does not dispute that her June 2013 statement was the last to include a KAE charge.  She further acknowledges that the statement contains what appear to be her own handwritten notes regarding a customer service call to Kohl's on June 25, 2013 regarding KAE.  J.A. 755-59.

Kohl's to cancel the product and remained knowingly enrolled in KAE as of her deposition for this case in August 2016.  J.A. 505.

### 4.  PrivacyGuard

Underwood was enrolled in PrivacyGuard through the Kohl's IVR system on activating a replacement Kohl's card in November 2010.  J.A. 6, 67.  When she received her welcome kit, she did not provide her social security number to Trilegiant to complete the second step of the activation process.  J.A. 6, 67.   She was billed the introductory rate of $2.95 in November 2010, and then $14.99 every month thereafter.  J.A. 784-85.

Underwood claims that she called Kohl's several times to cancel PrivacyGuard, and Kohl's records of Underwood's customer service interactions reflect a call on May 17, 2011 which refers to a request to cancel PrivacyGuard.  J.A. 74, 774.  But Underwood's enrollment was not cancelled at that time, and she continued to be charged for PrivacyGuard until she closed her Kohl's card account in June 2012.  J.A. 471-79.  On June 22, 2012, Underwood called Trilegiant directly to inform them she had closed her Kohl's card account and to learn more about PrivacyGuard.  J.A. 387, 416.  In that phone call, Underwood was told her enrollment would be cancelled due to the closure of her Kohl's card account.  J.A.  416.  Later that day, Underwood logged on to the PrivacyGuard website and provided her social security number to complete the second step of the activation process.  J.A. 406.  She viewed her credit report online that day, and received a handful of daily credit monitoring alerts before her final month of PrivacyGuard expired on July 11, 2012.  J.A. 401, 406.

## II.  LEGAL STANDARD

"[S]ummary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'"  *Alabama v. North*

*Carolina*, 560 U.S. 330, 344 (2010) (quoting Fed. R. Civ. P. 56(c)). A fact is material if it might affect the outcome of the suit under the governing law, *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006), and "[a] genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-52 (1986)). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48.

In deciding a motion for summary judgment, "[t]he reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Abington Friends Sch.*, 480 F.3d at 256 (citing *Celotex*, 477 U.S. at 322-26). In demonstrating that a genuine factual dispute exists, "the non-moving party must rebut the motion with facts in the record," *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006), and "may not rest on speculation and conjecture in opposing a motion for summary judgment." *Ramara, Inc. v. Westfield Ins. Co.*, 814 F. 3d 660, 666 (3d Cir. 2016). While a court may not weigh evidence at the summary judgment stage, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].'" *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007)

(quoting *Anderson*, 477 U.S. at 252) (alteration in *Jakimas*). In other words, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial," and summary judgment is warranted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

Although Plaintiffs have emphasized the alleged gap between the prices charged for KAE and PrivacyGuard and the actual value these products provided to customers – and pointed to Defendants' concerns about regulatory scrutiny of this purported gap as evidence to support their claims – this case is not based on federal credit card regulations or any state's consumer protection laws. Rather, Plaintiffs have brought claims based on contract (good faith and fair dealing) and quasi-contract (unjust enrichment) theories of recovery. Defendants' contends that Plaintiffs' claims are foreclosed because they entered into express contracts for KAE and PrivacyGuard. Plaintiffs' response is that the contracts authorizing both programs were not valid after the assignment of Plaintiffs' Kohl's card accounts to Capital One in 2011.

### A. Choice of Law

Before addressing that issue, it is necessary to clear up once and for all which law governs those claims. Although the Court previously ruled on the basis of the allegations made in and the documents attached to the Complaint, that Virginia law governs claims arising from the *Capital One* Cardmember Agreement, *see Gordon v. Kohl's Dep't Stores, Inc.*, 172 F. Supp. 3d 850, 852 n.5 (E.D. Pa. 2016), it is now apparent that Plaintiffs never received that version of the Cardmember Agreement. [6] Defendants now argue that claims concerning Plaintiffs' accounts

---

[6] As a federal court presiding over a case under diversity jurisdiction, the Court must apply the choice-of-law rules of the state in which it sits. *Budget Rent-A-Car Sys., Inc. v. Chappell*, 407 F.3d 166, 169 (3d Cir. 2005). "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them." *Kruzits v. Okuma Mach. Tools, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994) (citing *Smith v.*

are therefore governed by Delaware law – as prescribed by the choice of law provision in the Chase Cardmember Agreement that Plaintiffs received when they opened their accounts. Plaintiffs counter that any customer who asked for a copy of their Cardmember Agreement after April 1, 2011 was provided with a copy of the Capital One version, which was also posted on the Kohl's website after that date, to argue that the choice of Virginia law in the Capital One Cardmember Agreement governs this case.

This choice of law question can be resolved by a straightforward reading of the Cardmember Agreements. The Chase Cardmember Agreement provides that Chase "may add or delete a term or change any term of the Agreement . . . by furnishing you notice of the change in the manner required by applicable law." J.A. 18. Regardless of what the applicable law requires, Plaintiffs were not furnished any notice of the change from Delaware to Virginia law. Although customers were sent notifications regarding several other changes in terms, as well as the change in ownership of their accounts, there is no evidence in the record that Plaintiffs were ever informed of the change in governing law or alerted that the change was posted on a website. Since notice was never issued, the change in terms was not implemented according to the plain language of the existing agreement, and the Delaware choice of law provision was thus never modified. The Delaware choice-of-law provision from the Chase Cardmember Agreement therefore remained in effect at all relevant times, and to the extent that Plaintiffs' claims fall within its scope, they are governed by Delaware law.

Defendants suggest that the contractual choice of law provisions govern only claims arising from the agreements themselves, and not every claim related to Plaintiffs' accounts. This

---

*Commw. Nat'l Bank*, 557 A.2d 775, 777 (Pa. Super. Ct. 1989), *app. denied*, 569 A.2d 1359 (Pa. 1990)). Accordingly, the Court shall look to the choice of law provisions in the contracts at issue in this case to determine which law applies.

issue requires the Court "to determine, based on their narrowness or breadth, whether the parties intended to encompass all elements of their association." *Jiffy Lube Int'l v. Jiffy Lube of Pa., Inc.*, 848 F. Supp. 569, 576 (E.D. Pa. 1994) (internal quotation marks omitted). The choice of law clause in the Chase Cardmember Agreement is broad: It provides that "the terms and enforcement of this agreement and your account shall be governed and interpreted in accordance with federal law and, to the extent state law applies, the law of Delaware." J.A. 875. Given that this clause expressly applies not only to the agreement but also "your account," the provision designates Delaware law not only for contract claims, but also for any other state-law claim arising from Plaintiffs' Kohl's card accounts. In light of this broad choice of law provision and the fact that Plaintiffs were never advised of any change in governing law, Delaware law applies to all of the claims Plaintiffs have asserted in this case.

**B.      Good Faith and Fair Dealing**

Turning now to Plaintiffs' claim for a breach of the implied covenant of good faith and fair dealing which, under Delaware law, is "a limited and extraordinary legal remedy." *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010). The covenant prohibits arbitrary and unreasonable conduct "which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2015) (internal quotation marks omitted). Since the implied covenant serves only to ensure that parties receive the benefit of their contractual bargains, it cannot "rewrite a contract [a plaintiff] now believes to have been a bad deal." *Nemec*, 991 A.2d at 1126. For this reason, a plaintiff "'generally cannot base a claim for breach of the implied covenant on conduct authorized by the agreement.'" *Id.* at 1125-26 (quoting *Dunlap*, 878 A.2d at 441). In other words, a breach of the implied covenant is a form of breaching the contract itself; the implied covenant does not create

a "free-floating" duty of fairness, so "[e]xpress contractual provisions always supersede the implied covenant." *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 441 (Del. Ch. 2012), *rev'd on other grounds*, 68 A.3d 665 (Del. 2013). This primacy of the express contractual terms applies even when "enforcement of the contract as written would raise moral questions." *Nemec*, 991 A.2d. at 1128.[7]

### 1.    KAE

Defendants argue that the KAE Amendment modified the Cardmember Agreement to expressly authorize charging Plaintiffs for KAE and therefore, as a matter of law, KAE fees cannot serve as the basis of a claim alleging breach of an implied covenant of good faith and fair dealing. Plaintiffs respond that any authorization or acceptance of KAE terms that may have existed when Chase owned their accounts was not valid after Capital One assumed the Kohl's card program.[8] This presents a fundamental threshold question regarding Plaintiffs' KAE-related good faith and fair dealing claims. If the record reveals that KAE was, in fact, expressly authorized and that this authorization was validly assigned to Capital One, Plaintiffs' good faith and fair dealing claims cannot survive.

---

[7] Although Delaware law applies, there is no material difference between the law of Delaware and Virginia regarding the implied covenant of good faith and fair dealing. Under Virginia law, as under Delaware law, conduct expressly authorized by a contract cannot support a good faith and fair dealing claim. *See Gordon*, 172 F. Supp. 3d at 853.

[8] Plaintiffs conceded at oral argument on the motion for summary judgment that they are no longer challenging their initial enrollment in KAE. *See* Pls.' Br. at 29; Oral Arg. Tr. July 27, 2017 at 7:2-3. In light of this clarification, the "No Value" theory described by the Court at the motion to dismiss stage is no longer viable, since that theory rested on the premise that Plaintiffs did not actually enroll in KAE and were instead unilaterally enrolled by Chase as an arbitrary exercise of Chase's discretion under the Cardmember Agreement. *See Gordon*, 172 F. Supp. 3d at 863. Plaintiffs have now clarified that their claims rest entirely on the premise that their pre-existing KAE authorization did not survive the transfer to Capital One (*i.e.*, the "No Authorization" theory).

Plaintiffs do not dispute their initial enrollment in KAE, which occurred at the time that Plaintiffs each opened their Kohl's card accounts in 2007, 2009, and 2010, respectively.[9] Plaintiffs argue, however, that this authorization of Chase-administered KAE did not transfer to Capital One when Capital One assumed ownership of the accounts on April 1, 2011.

At the Motion to Dismiss stage, the Court ruled that Plaintiffs' authorization of KAE under the Chase KAE Amendment was transferred to Capital One through the Purchase Agreement between the two banks – an assignment of rights that is specifically authorized by the Chase Cardmember Agreement. *Gordon*, 172 F. Supp. 3d at 854-56. The Court allowed Plaintiffs' claims to proceed, however, by leaving the door open for Plaintiffs to show that an allegedly adverse change from Delaware to Virginia governing law reflected in the Capital One KAE Amendment disturbed the pre-existing authorization for KAE.[10]

At this juncture, there is neither a factual nor legal basis to support Plaintiffs' argument. As a factual matter, discovery has revealed that Plaintiffs never received the Capital One KAE Amendment, so the change to Virginia law was not imposed on Plaintiffs. As a legal matter, Plaintiffs have not identified any authority to support the proposition that a single adverse change in the Capital One KAE Amendment would disturb the pre-existing KAE authorization. By the

---

[9] Despite "not challenging" their initial KAE enrollments, Plaintiffs have not unequivocally accepted their "voluntary enrollment" in KAE as an undisputed fact. The record does not reveal a genuine factual dispute on this point, however, as uncontested evidence establishes that Plaintiffs were required to either "Accept" or "Decline" KAE when they opened their Kohl's card accounts and Kohl's internal records reflect that each Plaintiff accepted. J.A. 3. Although Plaintiffs do not recall the specifics of their enrollment and Tantlinger insists that she never signed up for KAE, Plaintiffs have not presented any evidence to rebut Defendants' account of the KAE enrollment process or the records showing that each Plaintiff "Accepted" KAE on the point-of-sale pin pad, thus – despite Plaintiffs' refusal to accept their "voluntary enrollment" as undisputed – there is no genuine factual dispute about this issue. *See Anderson.*, 477 U.S. at 257 ("[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment.").

[10] Plaintiffs argued that this change was adverse because Virginia consumer protection law allegedly imposes a more burdensome standard in consumer protection cases than Delaware law. This argument is distinct from the question of which state's law governs Plaintiffs' claims in this case, which is determined by the governing law provision in the underlying Cardmember Agreement.

terms of the KAE Amendment itself, the only impact of an improperly implemented adverse change in terms would be that the change itself would not take effect.

Since the record establishes that Plaintiffs' KAE authorization was assigned to Capital One, Plaintiffs' KAE-related good faith and fair dealing claims could survive only if Defendants failed to honor the terms of KAE in good faith. But Plaintiffs received exactly what is described in their KAE contracts: The right to claim up to $10,000 worth of debt cancellation if any one of a set of clearly defined contingencies occurred, in exchange for payments of $1.60 for every $100 on their ending monthly balances. There is no evidence that Plaintiffs were denied (or even attempted to claim) the benefits of KAE, nor that they were ever charged anything other than the price set forth in the KAE Amendment and on the enrollment pin pad. Although Plaintiffs have presented evidence that they could have obtained a better deal or a refund if they had complained about KAE, this does not change the fact that Plaintiffs received exactly what their contracts described. As the Delaware Supreme Court has observed, "[p]arties have a right to enter into good and bad contracts, the law enforces both." *Nemec*, 991 A.2d at 1126. Defendants' motion for summary judgment shall be granted with respect to Plaintiffs' KAE-related claims of a breach of the implied covenant of good faith and fair dealing.

## 2. PrivacyGuard

Turning to PrivacyGuard, which was billed only to Underwood, Defendants argue that they cannot be liable because the product was provided not by Defendants, but rather by a third party, Trilegiant, and was governed by a contract between Trilegiant and the customer. Thus, Defendants contend, PrivacyGuard cannot serve as the basis for Underwood's good faith and fair dealing claim, which is expressly based on the Cardmember Agreement. *See* Second Amended Complaint ¶¶ 57-58, 61-62; *see also Anderson v. Wachovia Mortg. Corp.*, 497 F. Supp. 2d 572,

581-82 (D. Del. 2007) (noting that a claim for breach of implied covenant of good faith and fair dealing requires plaintiff to identify a contract which contains the implied covenant).

The record confirms Defendants' account of PrivacyGuard's structure. Although PrivacyGuard was marketed to existing and prospective Kohl's customers pursuant to a Marketing Agreement between Kohl's and Trilegiant, the product itself was governed by Trilegiant's contracts with consumers, which authorized it to bill their Kohl's credit cards for the PrivacyGuard membership fee. Since neither the substance of PrivacyGuard nor the marketing of third-party products was governed by the Cardmember Agreement, Underwood has not shown a connection between Kohl's PrivacyGuard-related actions and the Cardmember Agreement.[11] Her good faith and fair dealing claim against Kohl's therefore cannot survive.

Neither did Underwood have a contractual relationship with Capitol One for the provision of PrivacyGuard. Capital One's role with respect to Underwood's PrivacyGuard enrollment was to provide her with the credit she used to pay for the product. That creditor role was defined in the Cardmember Agreement, which expressly provided that: "In return for extending credit to you on this Account from time to time, you agree to pay us [creditor and issuer] for all goods and services you charge to this Account." J.A. 18. The fact that Underwood billed her purchase of PrivacyGuard to her Kohl's card does not bring the value or administration of PrivacyGuard within the purview of the implied covenant of good faith and fair dealing in the Cardmember Agreement. To conclude otherwise would be antithetical to the narrow scope of the implied covenant under Delaware law and would instead suggest the type of "free-floating"

_____

[11] Underwood argues that Kohl's acted as Trilegiant's undisclosed agent through its marketing activities. Pls.' Br. at 26 n.12 (citing *Seaford Steel Prods. v. Taubler*, 1987 WL 18427 (Del. Super. Ct. Oct. 6, 1987). Regardless of whether this undisclosed agent theory has merit with respect to the PrivacyGuard agreement or any agreements that may have been created in the course of Kohl's marketing activities, this argument does not establish a connection between PrivacyGuard and the Cardmember Agreement upon which Underwood's claim is based. Thus, *assuming arguendo* that Kohl's did act as an undisclosed agent of Trilegiant at some stage in the PrivacyGuard marketing process, that transaction did not occur under the auspices of the Cardmember Agreement; it was a separate act, distinct from the obligations and rights established by the Cardmember Agreement.

duty of fairness between contracting parties that Delaware courts have firmly rejected. *See ASB Allegiance*, 50 A.3d at 441; *see also Nemec*, 991 A.2d at 1128 (noting that the implied covenant is a limited remedy that serves only to ensure that parties receive the benefits of their contracts and does not create additional duties).

Since Kohl's marketing and administration of PrivacyGuard was entirely separate from the Cardmember Agreement, and Capital One's extension of credit to Underwood did not bring the products purchased with her Kohl's card within the scope of the implied covenant of good faith and fair dealing in that Agreement, Defendants' motion for summary judgment shall be granted with respect to Underwood's PrivacyGuard-related good faith and fair dealing claim.

### C.  Unjust Enrichment

Turning to Plaintiffs' unjust enrichment claims, Defendants again respond that the claims are foreclosed by the existence of express contracts regarding KAE and PrivacyGuard and, even if no express contracts foreclose the claims, Plaintiffs cannot recover for unjust enrichment because they voluntarily paid their KAE and PrivacyGuard fees.

The elements of unjust enrichment under Delaware law are: "(1) an enrichment [of defendant], (2) an impoverishment [of plaintiff], (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec*, 991 A.2d at 1130. While the "absence of justification" prong encompasses broad "principles of justice or equity and good conscience," *id.*, "[a] claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009). Framed in terms of the elements of unjust enrichment, conduct authorized by a contract is justified and therefore cannot serve as the basis for an unjust enrichment claim. *See Nemec*, 991

A.2d at 1131 (dismissing unjust enrichment claim for the same reasons as a breach of the covenant of good faith and fair dealing claim: the allegedly unjust conduct was expressly authorized by the contract). Since KAE and PrivacyGuard were governed by different contracts, Plaintiffs' claims with respect to each product must be analyzed separately.

### 1. KAE

Turning first to KAE, there is no genuine dispute that Plaintiffs agreed to the Chase KAE Amendment (later assigned to Capital One), which expressly authorized KAE at the rate of $1.60 per $100 of monthly balance. As discussed above in the context of Plaintiffs' good faith and fair dealing claim, there is no evidence that Plaintiffs were ever denied the benefits of KAE or charged more than the KAE Amendment expressly described. The collection of KAE fees was therefore legally justified, and Defendants are entitled to summary judgment on Plaintiffs' KAE-related unjust enrichment claims.[12]

### 2. PrivacyGuard

Turning to PrivacyGuard, while Underwood acknowledges that she signed up for PrivacyGuard, she also claims that she attempted to cancel PrivacyGuard several times, but continued to be charged for several months after her cancellation calls. This testimony is corroborated by Kohl's internal records, which reveal a phone call concerning cancellation on May 17, 2011 – more than a year before Underwood's PrivacyGuard enrollment was actually cancelled. While unjust enrichment claims arising from fees incurred prior to February 13, 2012 have already been dismissed as time barred,[13] the evidence regarding Underwood's attempted

---

[12] Plaintiffs argue that if Kohl's was not a party to the Cardmember Agreements and KAE Amendments – a matter that remains in dispute – then those agreements do not foreclose an unjust enrichment claim against Kohl's. In this case, however, the KAE Amendment not only serves as a formal bar to claims arising from the KAE Amendment against parties to that contract, it also provides legal justification for collecting KAE fees from Plaintiffs. Thus, regardless of whether Kohl's was a party to the agreements, the collection of KAE fees from Plaintiffs was not "without justification" and cannot serve as the basis for an unjust enrichment claim.

cancellation of PrivacyGuard in 2011 would allow a factfinder to reasonably conclude that the collection of PrivacyGuard fees after that attempted cancellation on May 17, 2011 was not justified.[14]

Defendants argue that even if certain PrivacyGuard fees were unjustified, the voluntary payment doctrine bars Underwood's recovery because she knew about the fees and paid her bills anyway. Plaintiffs counter that Underwood did not, in fact, know why she continued to accrue charges on her Kohl's card even after she stopped using it to purchase merchandise from Kohl's. Under Delaware law, the voluntary payment doctrine bars recovery only when payment was made "with full knowledge of the facts." *Nieves v. All Star Title, Inc.*, C.A. No. 10C-03-191, 2010 WL 2977966, at *6 (Del. Super. Ct. July 27, 2010). Accordingly, "money paid under a mistake of fact may be recovered in equity under an unjust enrichment theory." *Home Ins. Co. v. Honaker*, 480 A.2d 652, 653 (Del. 1984).

At this juncture, there is a genuine dispute as to whether Underwood had full knowledge of the facts when she paid for the PrivacyGuard fees incurred prior to June 22, 2012. While Defendants note that PrivacyGuard appeared on each of Underwood's bills, Underwood claims that she was unaware of the source of the fees and simply paid her full balance and closed her card in June 2012 when Kohl's called her inquiring about her unpaid balance. Her testimony is corroborated by the fact that she did not complete the second activation step for PrivacyGuard

---

[13] Although the Court previously applied Virginia's statute of limitations and claim accrual law, *see Gordon*, 172 F. Supp. 3d at 861, the result is the same under Delaware law which, like Virginia, imposes a three-year limitation period on unjust enrichment claims and measures the claim accrual from the date of the wrongful act. *See Vichi v. Koninklijke Philips Elecs., N.V.*, C.A. No. 2578, 2009 WL 4345724, at *15 (Del. Ch. Dec. 1, 2009).

[14] Plaintiffs argue that it was unjustified for Defendants to charge Underwood the full price for PrivacyGuard prior to June 22, 2012 because she had not completed the second step in the benefit activation process. However, since Underwood's unjust enrichment claim for PrivacyGuard has already been dismissed as time barred for fees collected prior to February 13, 2012, *see Gordon*, 172 F. Supp. 3d at 861, and summary judgment is not warranted for fees collected after that date due to the dispute regarding Underwood's cancellation, it is not necessary at this juncture to determine if charging the full price for PrivacyGuard prior to the completion of the second activation step is, by itself, sufficient to support an unjust enrichment claim.

until June 22, 2012 – after she had called Trilegiant to tell them she had cancelled her Kohl's card. Given this dispute over Underwood's knowledge regarding PrivacyGuard fees, the voluntary payment doctrine does not warrant summary judgment on her claim.

It is undisputed, however, that Underwood completed her full PrivacyGuard activation by June 22, 2012 and viewed at least one credit report during the last month of her enrollment, which ended on July 11, 2012. Since Underwood knowingly used the full benefits of PrivacyGuard from June 22, 2012 until July 11, 2012, there is no basis to reasonably conclude that collection of PrivacyGuard fees during that time was without justification. Defendants are thus entitled to summary judgment on Underwood's PrivacyGuard-related unjust enrichment claims arising from the final 20 days of her enrollment. In sum, Defendants' motion for summary judgment shall be granted with respect to Underwood's PrivacyGuard-related unjust enrichment claim arising from fees corresponding to her enrollment beginning on June 22, 2012, but shall be denied with respect to PrivacyGuard fees accrued prior to that date (and collected after February 13, 2012).

An order follows.


**Dated: August 7, 2017**

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**

_____

**WENDY BEETLESTONE, J.**
